# FRIENDS OF THE EARTH, INC., ET AL. *v.* LAIDLAW ENVIRONMENTAL SERVICES (TOC), INC.

No. 98–822.   Argued October 12, 1999—Decided January 12, 2000

168

170

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined. STEVENS, J., *post*, p. 195, and KENNEDY, J., *post*, p. 197, filed concurring opinions. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 198.

*Bruce J. Terris* argued the cause for petitioners. With him on the briefs were *Carolyn Smith Pravlik* and *James S. Chandler, Jr.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* in support of petitioners. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Wallace,* and *David C. Shilton.*

*Donald A. Cockrill* argued the cause for respondent. With him on the briefs were *Stuart H. Newberger, Clifton S. Elgarten, Scott E. Gant, Henry H. Taylor,* and *Barbara J. Hamilton.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, *James R. Layton,* State Solicitor, *Joseph P. Bindbeutel* and *William J. Bryan,* Assistant Attorneys General, *Bill Lockyer,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Richard M. Frank,* Assistant Attorney General, and *Linus Masouredis,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *M. Jane Brady* of Delaware, *James E. Ryan* of Illinois, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Michael F. Easley* of North Carolina, *Sheldon Whitehouse* of Rhode Island, *Paul G. Summers* of Tennessee, and *Christine O. Gregoire* of Washington; for Americans for the Environment by *John D. Echeverria;* and for Public Citizen et al. by *Colette G. Matzzie, Brian Wolfman,* and *Steven R. Shapiro.*

Briefs of *amici curiae* urging affirmance were filed for the State of South Carolina by *Charles M. Condon,* Attorney General, and *Kenneth P. Woodington,* Senior Assistant Attorney General; for the Alliance of Automobile Manufacturers et al. by *Scott M. DuBoff, Kenneth S. Kaufman, Robin S. Conrad, David R. Case, J. Walker Henry, Jan Amundson,* and *Deborah Ann Hottel;* for the California Association of Sanitation Agencies by *Louis F. Claiborne* and *John Briscoe;* for Hercules Inc., by *Joel Schneider* and *Peter L. Frattarelli;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar.*

Briefs of *amici curiae* were filed for 40 California Cities et al. by *Rick W. Jarvis;* for the Natural Resources Defense Council, Inc., et al. by *Michael Axline* and *David A. Nicholas;* and for the Pacific Legal Foundation et al. by *Robin L. Rivett* and *M. Reed Hopper.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case presents an important question concerning the operation of the citizen-suit provisions of the Clean Water Act. Congress authorized the federal district courts to entertain Clean Water Act suits initiated by "a person or persons having an interest which is or may be adversely affected." 33 U. S. C. §§ 1365(a), (g). To impel future compliance with the Act, a district court may prescribe injunctive relief in such a suit; additionally or alternatively, the court may impose civil penalties payable to the United States Treasury. § 1365(a). In the Clean Water Act citizen suit now before us, the District Court determined that injunctive relief was inappropriate because the defendant, after the institution of the litigation, achieved substantial compliance with the terms of its discharge permit. 956 F. Supp. 588, 611 (SC 1997). The court did, however, assess a civil penalty of $405,800. *Id.*, at 610. The "total deterrent effect" of the penalty would be adequate to forestall future violations, the court reasoned, taking into account that the defendant "will be required to reimburse plaintiffs for a significant amount of legal fees and has, itself, incurred significant legal expenses." *Id.*, at 610–611.

The Court of Appeals vacated the District Court's order. 149 F. 3d 303 (CA4 1998). The case became moot, the appellate court declared, once the defendant fully complied with the terms of its permit and the plaintiff failed to appeal the denial of equitable relief. "[C]ivil penalties payable to the government," the Court of Appeals stated, "would not redress any injury Plaintiffs have suffered." *Id.*, at 307. Nor were attorneys' fees in order, the Court of Appeals noted, because absent relief on the merits, plaintiffs could not qualify as prevailing parties. *Id.*, at 307, n. 5.

We reverse the judgment of the Court of Appeals. The appellate court erred in concluding that a citizen suitor's claim for civil penalties must be dismissed as moot when the

defendant, albeit after commencement of the litigation, has come into compliance. In directing dismissal of the suit on grounds of mootness, the Court of Appeals incorrectly conflated our case law on initial standing to bring suit, see, *e. g., Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83 (1998), with our case law on postcommencement mootness, see, *e. g., City of Mesquite* v. *Aladdin's Castle, Inc.,* 455 U. S. 283 (1982). A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case. The Court of Appeals also misperceived the remedial potential of civil penalties. Such penalties may serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation.

## I

## A

In 1972, Congress enacted the Clean Water Act (Act), also known as the Federal Water Pollution Control Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 *et seq.* Section 402 of the Act, 33 U. S. C. § 1342, provides for the issuance, by the Administrator of the Environmental Protection Agency (EPA) or by authorized States, of National Pollutant Discharge Elimination System (NPDES) permits. NPDES permits impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters. Noncompliance with a permit constitutes a violation of the Act. § 1342(h).

Under § 505(a) of the Act, a suit to enforce any limitation in an NPDES permit may be brought by any "citizen," defined as "a person or persons having an interest which is or may be adversely affected." 33 U. S. C. §§ 1365(a), (g). Sixty days before initiating a citizen suit, however, the would-be plaintiff must give notice of the alleged violation to the EPA, the State in which the alleged violation oc-

curred, and the alleged violator. § 1365(b)(1)(A). "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus . . . render unnecessary a citizen suit." *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 60 (1987). Accordingly, we have held that citizens lack statutory standing under § 505(a) to sue for violations that have ceased by the time the complaint is filed. *Id.*, at 56–63. The Act also bars a citizen from suing if the EPA or the State has already commenced, and is "diligently prosecuting," an enforcement action. 33 U. S. C. § 1365(b)(1)(B).

The Act authorizes district courts in citizen-suit proceedings to enter injunctions and to assess civil penalties, which are payable to the United States Treasury. § 1365(a). In determining the amount of any civil penalty, the district court must take into account "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." § 1319(d). In addition, the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." § 1365(d).

## B

In 1986, defendant-respondent Laidlaw Environmental Services (TOC), Inc., bought a hazardous waste incinerator facility in Roebuck, South Carolina, that included a wastewater treatment plant. (The company has since changed its name to Safety-Kleen (Roebuck), Inc., but for simplicity we will refer to it as "Laidlaw" throughout.) Shortly after Laidlaw acquired the facility, the South Carolina Department

of Health and Environmental Control (DHEC), acting under 33 U. S. C. § 1342(a)(1), granted Laidlaw an NPDES permit authorizing the company to discharge treated water into the North Tyger River. The permit, which became effective on January 1, 1987, placed limits on Laidlaw's discharge of several pollutants into the river, including—of particular relevance to this case—mercury, an extremely toxic pollutant. The permit also regulated the flow, temperature, toxicity, and pH of the effluent from the facility, and imposed monitoring and reporting obligations.

Once it received its permit, Laidlaw began to discharge various pollutants into the waterway; repeatedly, Laidlaw's discharges exceeded the limits set by the permit. In particular, despite experimenting with several technological fixes, Laidlaw consistently failed to meet the permit's stringent 1.3 ppb (parts per billion) daily average limit on mercury discharges. The District Court later found that Laidlaw had violated the mercury limits on 489 occasions between 1987 and 1995. 956 F. Supp., at 613–621.

On April 10, 1992, plaintiff-petitioners Friends of the Earth (FOE) and Citizens Local Environmental Action Network, Inc. (CLEAN) (referred to collectively in this opinion, together with later joined plaintiff-petitioner Sierra Club, as "FOE") took the preliminary step necessary to the institution of litigation. They sent a letter to Laidlaw notifying the company of their intention to file a citizen suit against it under § 505(a) of the Act after the expiration of the requisite 60-day notice period, i. e., on or after June 10, 1992. Laidlaw's lawyer then contacted DHEC to ask whether DHEC would consider filing a lawsuit against Laidlaw. The District Court later found that Laidlaw's reason for requesting that DHEC file a lawsuit against it was to bar FOE's proposed citizen suit through the operation of 33 U. S. C. § 1365(b)(1)(B). 890 F. Supp. 470, 478 (SC 1995). DHEC agreed to file a lawsuit against Laidlaw; the company's law-

yer then drafted the complaint for DHEC and paid the filing fee. On June 9, 1992, the last day before FOE's 60-day notice period expired, DHEC and Laidlaw reached a settlement requiring Laidlaw to pay $100,000 in civil penalties and to make "'every effort'" to comply with its permit obligations. *Id.*, at 479–481.

On June 12, 1992, FOE filed this citizen suit against Laidlaw under § 505(a) of the Act, alleging noncompliance with the NPDES permit and seeking declaratory and injunctive relief and an award of civil penalties. Laidlaw moved for summary judgment on the ground that FOE had failed to present evidence demonstrating injury in fact, and therefore lacked Article III standing to bring the lawsuit. Record, Doc. No. 43. In opposition to this motion, FOE submitted affidavits and deposition testimony from members of the plaintiff organizations. Record, Doc. No. 71 (Exhs. 41–51). The record before the District Court also included affidavits from the organizations' members submitted by FOE in support of an earlier motion for preliminary injunctive relief. Record, Doc. No. 21 (Exhs. 5–10). After examining this evidence, the District Court denied Laidlaw's summary judgment motion, finding—albeit "by the very slimmest of margins"—that FOE had standing to bring the suit. App. in No. 97–1246 (CA4), pp. 207–208 (Tr. of Hearing 39–40 (June 30, 1993)).

Laidlaw also moved to dismiss the action on the ground that the citizen suit was barred under 33 U.S.C. § 1365(b)(1)(B) by DHEC's prior action against the company. The United States, appearing as *amicus curiae*, joined FOE in opposing the motion. After an extensive analysis of the Laidlaw-DHEC settlement and the circumstances under which it was reached, the District Court held that DHEC's action against Laidlaw had not been "diligently prosecuted"; consequently, the court allowed FOE's citizen suit to pro-

ceed. 890 F. Supp., at 499.[1] The record indicates that after FOE initiated the suit, but before the District Court rendered judgment, Laidlaw violated the mercury discharge limitation in its permit 13 times. 956 F. Supp., at 621. The District Court also found that Laidlaw had committed 13 monitoring and 10 reporting violations during this period. *Id.*, at 601. The last recorded mercury discharge violation occurred in January 1995, long after the complaint was filed but about two years before judgment was rendered. *Id.*, at 621.

On January 22, 1997, the District Court issued its judgment. 956 F. Supp. 588 (SC). It found that Laidlaw had gained a total economic benefit of $1,092,581 as a result of its extended period of noncompliance with the mercury discharge limit in its permit. *Id.*, at 603. The court concluded, however, that a civil penalty of $405,800 was adequate in light of the guiding factors listed in 33 U. S. C. § 1319(d). 956 F. Supp., at 610. In particular, the District Court stated that the lesser penalty was appropriate taking into account the judgment's "total deterrent effect." In reaching this determination, the court "considered that Laidlaw will be required to reimburse plaintiffs for a significant amount of legal fees." *Id.*, at 610–611. The court declined to grant FOE's request for injunctive relief, stating that an injunction was inappropriate because "Laidlaw has been in substantial compliance with all parameters in its NPDES permit since at least August 1992." *Id.*, at 611.

---

[1] The District Court noted that "Laidlaw drafted the state-court complaint and settlement agreement, filed the lawsuit against itself, and paid the filing fee." 890 F. Supp., at 489. Further, "the settlement agreement between DHEC and Laidlaw was entered into with unusual haste, without giving the Plaintiffs the opportunity to intervene." *Ibid.* The court found "most persuasive" the fact that "in imposing the civil penalty of $100,000 against Laidlaw, DHEC failed to recover, or even to calculate, the economic benefit that Laidlaw received by not complying with its permit." *Id.*, at 491.

FOE appealed the District Court's civil penalty judgment, arguing that the penalty was inadequate, but did not appeal the denial of declaratory or injunctive relief. Laidlaw cross-appealed, arguing, among other things, that FOE lacked standing to bring the suit and that DHEC's action qualified as a diligent prosecution precluding FOE's litigation. The United States continued to participate as *amicus curiae* in support of FOE.

On July 16, 1998, the Court of Appeals for the Fourth Circuit issued its judgment. 149 F. 3d 303. The Court of Appeals assumed without deciding that FOE initially had standing to bring the action, *id.*, at 306, n. 3, but went on to hold that the case had become moot. The appellate court stated, first, that the elements of Article III standing—injury, causation, and redressability—must persist at every stage of review, or else the action becomes moot. *Id.*, at 306. Citing our decision in *Steel Co.*, the Court of Appeals reasoned that the case had become moot because "the only remedy currently available to [FOE]—civil penalties payable to the government—would not redress any injury [FOE has] suffered." 149 F. 3d, at 306–307. The court therefore vacated the District Court's order and remanded with instructions to dismiss the action. In a footnote, the Court of Appeals added that FOE's "failure to obtain relief on the merits of [its] claims precludes any recovery of attorneys' fees or other litigation costs because such an award is available only to a 'prevailing or substantially prevailing party.'" *Id.*, at 307, n. 5 (quoting 33 U. S. C. § 1365(d)).

According to Laidlaw, after the Court of Appeals issued its decision but before this Court granted certiorari, the entire incinerator facility in Roebuck was permanently closed, dismantled, and put up for sale, and all discharges from the facility permanently ceased. Respondent's Suggestion of Mootness 3.

We granted certiorari, 525 U. S. 1176 (1999), to resolve the inconsistency between the Fourth Circuit's decision in this

case and the decisions of several other Courts of Appeals, which have held that a defendant's compliance with its permit after the commencement of litigation does not moot claims for civil penalties under the Act. See, *e. g., Atlantic States Legal Foundation, Inc.* v. *Stroh Die Casting Co.,* 116 F. 3d 814, 820 (CA7), cert. denied, 522 U. S. 981 (1997); *Natural Resources Defense Council, Inc.* v. *Texaco Rfg. and Mktg., Inc.,* 2 F. 3d 493, 503–504 (CA3 1993); *Atlantic States Legal Foundation, Inc.* v. *Pan American Tanning Corp.,* 993 F. 2d 1017, 1020–1021 (CA2 1993); *Atlantic States Legal Foundation, Inc.* v. *Tyson Foods, Inc.,* 897 F. 2d 1128, 1135–1136 (CA11 1990).

## II

## A

The Constitution's case-or-controversy limitation on federal judicial authority, Art. III, §2, underpins both our standing and our mootness jurisprudence, but the two inquiries differ in respects critical to the proper resolution of this case, so we address them separately. Because the Court of Appeals was persuaded that the case had become moot and so held, it simply assumed without deciding that FOE had initial standing. See *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 66–67 (1997) (court may assume without deciding that standing exists in order to analyze mootness). But because we hold that the Court of Appeals erred in declaring the case moot, we have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation. We therefore address the question of standing before turning to mootness.

In *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560–561 (1992), we held that, to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and

(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977).

Laidlaw contends first that FOE lacked standing from the outset even to seek injunctive relief, because the plaintiff organizations failed to show that any of their members had sustained or faced the threat of any "injury in fact" from Laidlaw's activities. In support of this contention Laidlaw points to the District Court's finding, made in the course of setting the penalty amount, that there had been "no demonstrated proof of harm to the environment" from Laidlaw's mercury discharge violations. 956 F. Supp., at 602; see also *ibid.* ("[T]he NPDES permit violations at issue in this citizen suit did not result in any health risk or environmental harm.").

The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry (as the dissent in essence does, *post*, at 199–200) is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit. Focusing properly on injury to the plaintiff, the District Court found that FOE had demonstrated sufficient injury to establish standing. App. in No. 97–1246 (CA4), at 207–208 (Tr. of Hearing 39–40). For example, FOE member Kenneth Lee Curtis averred in affidavits that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and that he would like to fish, camp, swim, and picnic in and near

the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges. Record, Doc. No. 71 (Exhs. 41, 42). Curtis reaffirmed these statements in extensive deposition testimony. For example, he testified that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about Laidlaw's discharges. *Ibid.* (Exh. 43, at 52–53; Exh. 44, at 33).

Other members presented evidence to similar effect. CLEAN member Angela Patterson attested that she lived two miles from the facility; that before Laidlaw operated the facility, she picnicked, walked, birdwatched, and waded in and along the North Tyger River because of the natural beauty of the area; that she no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants; and that she and her husband would like to purchase a home near the river but did not intend to do so, in part because of Laidlaw's discharges. Record, Doc. No. 21 (Exh. 10). CLEAN member Judy Pruitt averred that she lived one-quarter mile from Laidlaw's facility and would like to fish, hike, and picnic along the North Tyger River, but has refrained from those activities because of the discharges. *Ibid.* (Exh. 7). FOE member Linda Moore attested that she lived 20 miles from Roebuck, and would use the North Tyger River south of Roebuck and the land surrounding it for recreational purposes were she not concerned that the water contained harmful pollutants. Record, Doc. No. 71 (Exhs. 45, 46). In her deposition, Moore testified at length that she would hike, picnic, camp, swim, boat, and drive near or in the river were it not for her concerns about illegal discharges. *Ibid.* (Exh. 48, at 29, 36–37, 62–63, 72). CLEAN member Gail Lee attested that her home, which is near Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted

for some of the discrepancy. Record, Doc. No. 21 (Exh. 9). Sierra Club member Norman Sharp averred that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants. *Ibid.* (Exh. 8).

These sworn statements, as the District Court determined, adequately documented injury in fact. We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. *Sierra Club* v. *Morton,* 405 U. S. 727, 735 (1972). See also *Defenders of Wildlife,* 504 U. S., at 562–563 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.").

Our decision in *Lujan* v. *National Wildlife Federation,* 497 U. S. 871 (1990), is not to the contrary. In that case an environmental organization assailed the Bureau of Land Management's "land withdrawal review program," a program covering millions of acres, alleging that the program illegally opened up public lands to mining activities. The defendants moved for summary judgment, challenging the plaintiff organization's standing to initiate the action under the Administrative Procedure Act, 5 U. S. C. § 702. We held that the plaintiff could not survive the summary judgment motion merely by offering "averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." 497 U. S., at 889.

In contrast, the affidavits and testimony presented by FOE in this case assert that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of

those discharges, directly affected those affiants' recreational, aesthetic, and economic interests. These submissions present dispositively more than the mere "general averments" and "conclusory allegations" found inadequate in *National Wildlife Federation.* *Id.,* at 888. Nor can the affiants' conditional statements—that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it—be equated with the speculative " 'some day' intentions" to visit endangered species halfway around the world that we held insufficient to show injury in fact in *Defenders of Wildlife.* 504 U. S., at 564.

*Los Angeles* v. *Lyons,* 461 U. S. 95 (1983), relied on by the dissent, *post,* at 199, does not weigh against standing in this case. In *Lyons,* we held that a plaintiff lacked standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat from the policy. 461 U. S., at 107, n. 7. In the footnote from *Lyons* cited by the dissent, we noted that "[t]he reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct," and that his "subjective apprehensions" that such a recurrence would even *take place* were not enough to support standing. *Id.,* at 108, n. 8. Here, in contrast, it is undisputed that Laidlaw's unlawful conduct—discharging pollutants in excess of permit limits—was occurring at the time the complaint was filed. Under *Lyons,* then, the only "subjective" issue here is "[t]he reasonableness of [the] fear" that led the affiants to respond to that concededly ongoing conduct by refraining from use of the North Tyger River and surrounding areas. Unlike the dissent, *post,* at 200, we see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms. The proposition is en-

tirely reasonable, the District Court found it was true in this case, and that is enough for injury in fact.

Laidlaw argues next that even if FOE had standing to seek injunctive relief, it lacked standing to seek civil penalties. Here the asserted defect is not injury but redressability. Civil penalties offer no redress to private plaintiffs, Laidlaw argues, because they are paid to the Government, and therefore a citizen plaintiff can never have standing to seek them.

Laidlaw is right to insist that a plaintiff must demonstrate standing separately for each form of relief sought. See, e. g., *Lyons*, 461 U. S., at 109 (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); see also *Lewis* v. *Casey*, 518 U. S. 343, 358, n. 6 (1996) ("[S]tanding is not dispensed in gross."). But it is wrong to maintain that citizen plaintiffs facing ongoing violations never have standing to seek civil penalties.

We have recognized on numerous occasions that "all civil penalties have some deterrent effect." *Hudson* v. *United States*, 522 U. S. 93, 102 (1997); see also, e. g., *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S. 767, 778 (1994). More specifically, Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations. This congressional determination warrants judicial attention and respect. "The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. . . . [The district court may] seek to deter future violations by basing the penalty on its economic impact." *Tull* v. *United States*, 481 U. S. 412, 422–423 (1987).

It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively

abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

The dissent argues that it is the *availability* rather than the *imposition* of civil penalties that deters any particular polluter from continuing to pollute. *Post,* at 207–208. This argument misses the mark in two ways. First, it overlooks the interdependence of the availability and the imposition; a threat has no deterrent value unless it is credible that it will be carried out. Second, it is reasonable for Congress to conclude that an actual award of civil penalties does in fact bring with it a significant quantum of deterrence over and above what is achieved by the mere prospect of such penalties. A would-be polluter may or may not be dissuaded by the existence of a remedy on the books, but a defendant once hit in its pocketbook will surely think twice before polluting again.[2]

We recognize that there may be a point at which the deterrent effect of a claim for civil penalties becomes so insubstantial or so remote that it cannot support citizen standing. The fact that this vanishing point is not easy to ascertain does not detract from the deterrent power of such penalties in the ordinary case. Justice Frankfurter's observations for

---

[2] The dissent suggests that there was little deterrent work for civil penalties to do in this case because the lawsuit brought against Laidlaw by DHEC had already pushed the level of deterrence to "near the top of the graph." *Post,* at 208. This suggestion ignores the District Court's specific finding that the penalty agreed to by Laidlaw and DHEC was far too low to remove Laidlaw's economic benefit from noncompliance, and thus was inadequate to deter future violations. 890 F. Supp. 470, 491–494, 497–498 (SC 1995). And it begins to look especially farfetched when one recalls that Laidlaw itself prompted the DHEC lawsuit, paid the filing fee, and drafted the complaint. See *supra,* at 176–177, 178, n. 1.

the Court, made in a different context nearly 60 years ago, hold true here as well:

> "How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by *qui tam* action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choice. Judgment on the deterrent effect of the various weapons in the armory of the law can lay little claim to scientific basis." *Tigner* v. *Texas*, 310 U. S. 141, 148 (1940).[3]

In this case we need not explore the outer limits of the principle that civil penalties provide sufficient deterrence to support redressability. Here, the civil penalties sought by FOE carried with them a deterrent effect that made it likely, as opposed to merely speculative, that the penalties would redress FOE's injuries by abating current violations and preventing future ones—as the District Court reasonably found when it assessed a penalty of $405,800. 956 F. Supp., at 610–611.

Laidlaw contends that the reasoning of our decision in *Steel Co.* directs the conclusion that citizen plaintiffs have no standing to seek civil penalties under the Act. We disagree. *Steel Co.* established that citizen suitors lack standing to seek civil penalties for violations that have abated by the time of suit. 523 U. S., at 106–107. We specifically noted in that case that there was no allegation in the complaint of any continuing or imminent violation, and that no basis for such an allegation appeared to exist. *Id.*, at 108; see also *Gwaltney*, 484 U. S., at 59 ("the harm sought to be addressed by

---

[3] In *Tigner* the Court rejected an equal protection challenge to a statutory provision exempting agricultural producers from the reach of the Texas antitrust laws.

the citizen suit lies in the present or the future, not in the past"). In short, *Steel Co.* held that private plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations, but our decision in that case did not reach the issue of standing to seek penalties for violations that are ongoing at the time of the complaint and that could continue into the future if undeterred.[4]

---

[4] In insisting that the redressability requirement is not met, the dissent relies heavily on *Linda R. S.* v. *Richard D.*, 410 U. S. 614 (1973). That reliance is sorely misplaced. In *Linda R. S.*, the mother of an out-of-wedlock child filed suit to force a district attorney to bring a criminal prosecution against the absentee father for failure to pay child support. *Id.*, at 616. In finding that the mother lacked standing to seek this extraordinary remedy, the Court drew attention to "the special status of criminal prosecutions in our system," *id.*, at 619, and carefully limited its holding to the "unique context of a challenge to [the nonenforcement of] a criminal statute," *id.*, at 617. Furthermore, as to redressability, the relief sought in *Linda R. S.*—a prosecution which, if successful, would automatically land the delinquent father in jail for a fixed term, *id.*, at 618, with predictably negative effects on his earning power—would scarcely remedy the plaintiff's lack of child support payments. In this regard, the Court contrasted "the civil contempt model whereby the defendant 'keeps the keys to the jail in his own pocket' and may be released whenever he complies with his legal obligations." *Ibid.* The dissent's contention, *post*, at 204, that "precisely the same situation exists here" as in *Linda R. S.* is, to say the least, extravagant.

Putting aside its mistaken reliance on *Linda R. S.*, the dissent's broader charge that citizen suits for civil penalties under the Act carry "grave implications for democratic governance," *post*, at 202, seems to us overdrawn. Certainly the Federal Executive Branch does not share the dissent's view that such suits dissipate its authority to enforce the law. In fact, the Department of Justice has endorsed this citizen suit from the outset, submitting *amicus* briefs in support of FOE in the District Court, the Court of Appeals, and this Court. See *supra*, at 177, 179. As we have already noted, *supra*, at 175, the Federal Government retains the power to foreclose a citizen suit by undertaking its own action. 33 U. S. C. § 1365(b)(1)(B). And if the Executive Branch opposes a particular citizen suit, the statute allows the Administrator of the EPA to "intervene as a matter of right" and bring the Government's views to the attention of the court. § 1365(c)(2).

## B

Satisfied that FOE had standing under Article III to bring this action, we turn to the question of mootness.

The only conceivable basis for a finding of mootness in this case is Laidlaw's voluntary conduct—either its achievement by August 1992 of substantial compliance with its NPDES permit or its more recent shutdown of the Roebuck facility. It is well settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite*, 455 U. S., at 289. "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id.*, at 289, n. 10 (citing *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632 (1953)). In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968). The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Ibid.*

The Court of Appeals justified its mootness disposition by reference to *Steel Co.*, which held that citizen plaintiffs lack standing to seek civil penalties for wholly past violations. In relying on *Steel Co.*, the Court of Appeals confused mootness with standing. The confusion is understandable, given this Court's repeated statements that the doctrine of mootness can be described as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English*, 520 U. S., at 68, n. 22 (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 397 (1980), in turn

quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L. J. 1363, 1384 (1973)) (internal quotation marks omitted).

Careful reflection on the long-recognized exceptions to mootness, however, reveals that the description of mootness as "standing set in a time frame" is not comprehensive. As just noted, a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur. *Concentrated Phosphate Export Assn.*, 393 U. S., at 203. By contrast, in a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the "threatened injury [is] certainly impending." *Whitmore* v. *Arkansas*, 495 U. S. 149, 158 (1990) (citations and internal quotation marks omitted). Thus, in *Lyons*, as already noted, we held that a plaintiff lacked initial standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat arising from the policy. 461 U. S., at 105–110. Elsewhere in the opinion, however, we noted that a citywide moratorium on police chokeholds—an action that surely diminished the already slim likelihood that any particular individual would be choked by police—would not have mooted an otherwise valid claim for injunctive relief, because the moratorium by its terms was not permanent. *Id.*, at 101. The plain lesson of these cases is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.

Furthermore, if mootness were simply "standing set in a time frame," the exception to mootness that arises when the defendant's allegedly unlawful activity is "capable of repetition, yet evading review," could not exist. When, for exam-

ple, a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, *Olmstead* v. *L. C.*, 527 U. S. 581, 594, n. 6 (1999), despite the fact that she would have lacked initial standing had she filed the complaint after the transfer. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum. See *Steel Co.*, 523 U. S., at 109 ("'the mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced'") (quoting *Renne* v. *Geary*, 501 U. S. 312, 320 (1991)).

We acknowledged the distinction between mootness and standing most recently in *Steel Co.*:

> "The United States . . . argues that the injunctive relief does constitute remediation because 'there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation,' even if that occurs before a complaint is filed. . . . This makes a sword out of a shield. The 'presumption' the Government refers to has been applied to refute the assertion of mootness by a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity. . . . It is an immense and unacceptable stretch to call the presumption into service as a substitute for the allegation of present or threatened injury upon which initial standing must be based." 523 U. S., at 109.

Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To

abandon the case at an advanced stage may prove more wasteful than frugal. This argument from sunk costs[5] does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died. See, *e. g., DeFunis* v. *Odegaard,* 416 U. S. 312 (1974) *(per curiam)* (non-class-action challenge to constitutionality of law school admissions process mooted when plaintiff, admitted pursuant to preliminary injunction, neared graduation and defendant law school conceded that, as a matter of ordinary school policy, plaintiff would be allowed to finish his final term); *Arizonans,* 520 U. S., at 67 (non-class-action challenge to state constitutional amendment declaring English the official language of the State became moot when plaintiff, a state employee who sought to use her bilingual skills, left state employment). But the argument surely highlights an important difference between the two doctrines. See generally *Honig* v. *Doe,* 484 U. S. 305, 329–332 (1988) (REHNQUIST, C. J., concurring).

In its brief, Laidlaw appears to argue that, regardless of the effect of Laidlaw's compliance, FOE doomed its own civil penalty claim to mootness by failing to appeal the District Court's denial of injunctive relief. Brief for Respondent 14–17. This argument misconceives the statutory scheme. Under § 1365(a), the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones. "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."

---

[5] Of course we mean sunk costs to the judicial system, not to the litigants. *Lewis* v. *Continental Bank Corp.,* 494 U. S. 472 (1990) (cited by the dissent, *post,* at 213), dealt with the latter, noting that courts should use caution to avoid carrying forward a moot case solely to vindicate a plaintiff's interest in recovering attorneys' fees.

*Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982). Denial of injunctive relief does not necessarily mean that the district court has concluded there is no prospect of future violations for civil penalties to deter. Indeed, it meant no such thing in this case. The District Court denied injunctive relief, but expressly based its award of civil penalties on the need for deterrence. See 956 F. Supp., at 610–611. As the dissent notes, *post,* at 205, federal courts should aim to ensure "'the framing of relief no broader than required by the precise facts.'" *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208, 222 (1974). In accordance with this aim, a district court in a Clean Water Act citizen suit properly may conclude that an injunction would be an excessively intrusive remedy, because it could entail continuing superintendence of the permit holder's activities by a federal court—a process burdensome to court and permit holder alike. See *City of Mesquite,* 455 U. S., at 289 (although the defendant's voluntary cessation of the challenged practice does not moot the case, "[s]uch abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice").

Laidlaw also asserts, in a supplemental suggestion of mootness, that the closure of its Roebuck facility, which took place after the Court of Appeals issued its decision, mooted the case. The facility closure, like Laidlaw's earlier achievement of substantial compliance with its permit requirements, might moot the case, but—we once more reiterate—only if one or the other of these events made it absolutely clear that Laidlaw's permit violations could not reasonably be expected to recur. *Concentrated Phosphate Export Assn.,* 393 U. S., at 203. The effect of both Laidlaw's compliance and the facility closure on the prospect of future violations is a disputed factual matter. FOE points out, for example—and Laidlaw does not appear to contest—that Laidlaw retains its

NPDES permit. These issues have not been aired in the lower courts; they remain open for consideration on remand.[6]

## C

FOE argues that it is entitled to attorneys' fees on the theory that a plaintiff can be a "prevailing party" for purposes of 33 U. S. C. § 1365(d) if it was the "catalyst" that triggered a favorable outcome. In the decision under review, the Court of Appeals noted that its Circuit precedent construed our decision in *Farrar* v. *Hobby,* 506 U. S. 103 (1992), to require rejection of that theory. 149 F. 3d, at 307, n. 5 (citing *S–1 & S–2* v. *State Bd. of Ed. of N. C.,* 21 F. 3d 49, 51 (CA4 1994) (en banc)). Cf. *Foreman* v. *Dallas County,* 193 F. 3d 314, 320 (CA5 1999) (stating, in dicta, that "[a]fter *Farrar* . . . the continuing validity of the catalyst theory is in serious doubt").

*Farrar* acknowledged that a civil rights plaintiff awarded nominal damages may be a "prevailing party" under 42 U. S. C. § 1988. 506 U. S., at 112. The case involved no catalytic effect. Recognizing that the issue was not presented for this Court's decision in *Farrar,* several Courts of Appeals have expressly concluded that *Farrar* did not repudiate the catalyst theory. See *Marbley* v. *Bane,* 57 F. 3d 224, 234 (CA2 1995); *Baumgartner* v. *Harrisburg Housing Authority,* 21 F. 3d 541, 546–550 (CA3 1994); *Zinn* v. *Shalala,* 35 F. 3d 273, 276 (CA7 1994); *Little Rock School Dist.* v. *Pulaski County Special Sch. Dist., #1,* 17 F. 3d 260, 263, n. 2 (CA8 1994); *Kilgour* v. *Pasadena,* 53 F. 3d 1007, 1010 (CA9 1995);

---

[6] We note that it is far from clear that vacatur of the District Court's judgment would be the appropriate response to a finding of mootness on appeal brought about by the voluntary conduct of the party that lost in the District Court. See *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership,* 513 U. S. 18 (1994) (mootness attributable to a voluntary act of a nonprevailing party ordinarily does not justify vacatur of a judgment under review); see also *Walling* v. *James V. Reuter, Inc.,* 321 U. S. 671 (1944).

*Beard* v. *Teska,* 31 F. 3d 942, 951–952 (CA10 1994); *Morris* v. *West Palm Beach,* 194 F. 3d 1203, 1207 (CA11 1999).   Other Courts of Appeals have likewise continued to apply the catalyst theory notwithstanding *Farrar.   Paris* v. *United States Dept. of Housing and Urban Development,* 988 F. 2d 236, 238 (CA1 1993); *Citizens Against Tax Waste* v. *Westerville City School,* 985 F. 2d 255, 257 (CA6 1993).

It would be premature, however, for us to address the continuing validity of the catalyst theory in the context of this case.   The District Court, in an order separate from the one in which it imposed civil penalties against Laidlaw, stayed the time for a petition for attorneys' fees until the time for appeal had expired or, if either party appealed, until the appeal was resolved.   See 149 F. 3d, at 305 (describing order staying time for attorneys' fees petition).   In the opinion accompanying its order on penalties, the District Court stated only that "this court has considered that Laidlaw will be required to reimburse plaintiffs for a significant amount of legal fees," and referred to "potential fee awards."   956 F. Supp., at 610–611.   Thus, when the Court of Appeals addressed the availability of counsel fees in this case, no order was before it either denying or awarding fees.   It is for the District Court, not this Court, to address in the first instance any request for reimbursement of costs, including fees.

\*      \*      \*

For the reasons stated, the judgment of the United States Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Although the Court has identified a sufficient reason for rejecting the Court of Appeals' mootness determination, it is important also to note that the case would not be moot

even if it were absolutely clear that respondent had gone out of business and posed no threat of future permit violations. The District Court entered a valid judgment requiring respondent to pay a civil penalty of $405,800 to the United States. No postjudgment conduct of respondent could retroactively invalidate that judgment. A record of voluntary postjudgment compliance that would justify a decision that injunctive relief is unnecessary, or even a decision that any claim for injunctive relief is now moot, would not warrant vacation of the valid money judgment.

Furthermore, petitioners' claim for civil penalties would not be moot even if it were absolutely clear that respondent's violations could not reasonably be expected to recur because respondent achieved substantial compliance with its permit requirements after petitioners filed their complaint but before the District Court entered judgment. As the Courts of Appeals (other than the court below) have uniformly concluded, a polluter's voluntary postcomplaint cessation of an alleged violation will not moot a citizen-suit claim for civil penalties even if it is sufficient to moot a related claim for injunctive or declaratory relief.* This conclusion is consistent with the structure of the Clean Water Act, which attaches liability for civil penalties at the time a permit violation occurs. 33 U. S. C. § 1319(d) ("Any person who violates

---

*Comfort Lake Assn. v. Dresel Contracting, Inc., 138 F. 3d 351, 356 (CA8 1998); Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co., 116 F. 3d 814, 820 (CA7), cert. denied, 522 U. S. 981 (1997); Natural Resources Defense Council v. Texaco Refining & Mktg., Inc., 2 F. 3d 493, 502–503 (CA3 1993); Atlantic States Legal Foundation, Inc. v. Pan Am. Tanning Corp., 993 F. 2d 1017, 1020–1021 (CA2 1993); Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F. 2d 1128, 1134–1137 (CA11 1990); Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 890 F. 2d 690, 696–697 (CA4 1989). Cf. Powell v. McCormack, 395 U. S. 486, 496, n. 8 (1969) ("Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests").

[certain provisions of the Act or certain permit conditions and limitations] shall be subject to a civil penalty . . .”). It is also consistent with the character of civil penalties, which, for purposes of mootness analysis, should be equated with punitive damages rather than with injunctive or declaratory relief. See *Tull* v. *United States*, 481 U. S. 412, 422–423 (1987). No one contends that a defendant's postcomplaint conduct could moot a claim for punitive damages; civil penalties should be treated the same way.

The cases cited by the Court in its discussion of the mootness issue all involved requests for injunctive or declaratory relief. In only one, *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983), did the plaintiff seek damages, and in that case the opinion makes it clear that the inability to obtain injunctive relief would have no impact on the damages claim. *Id.*, at 105, n. 6, 109. There is no precedent, either in our jurisprudence, or in any other of which I am aware, that provides any support for the suggestion that postcomplaint factual developments that might moot a claim for injunctive or declaratory relief could either moot a claim for monetary relief or retroactively invalidate a valid money judgment.

JUSTICE KENNEDY, concurring.

Difficult and fundamental questions are raised when we ask whether exactions of public fines by private litigants, and the delegation of Executive power which might be inferable from the authorization, are permissible in view of the responsibilities committed to the Executive by Article II of the Constitution of the United States. The questions presented in the petition for certiorari did not identify these issues with particularity; and neither the Court of Appeals in deciding the case nor the parties in their briefing before this Court devoted specific attention to the subject. In my view these matters are best reserved for a later case. With this observation, I join the opinion of the Court.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

The Court begins its analysis by finding injury in fact on the basis of vague affidavits that are undermined by the District Court's express finding that Laidlaw's discharges caused no demonstrable harm to the environment. It then proceeds to marry private wrong with public remedy in a union that violates traditional principles of federal standing—thereby permitting law enforcement to be placed in the hands of private individuals. Finally, the Court suggests that to avoid mootness one needs even less of a stake in the outcome than the Court's watered-down requirements for initial standing. I dissent from all of this.

I

Plaintiffs, as the parties invoking federal jurisdiction, have the burden of proof and persuasion as to the existence of standing. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992) (hereinafter *Lujan*); *FW/PBS, Inc.* v. *Dallas*, 493 U. S. 215, 231 (1990). The plaintiffs in this case fell far short of carrying their burden of demonstrating injury in fact. The Court cites affiants' testimony asserting that their enjoyment of the North Tyger River has been diminished due to "concern" that the water was polluted, and that they "believed" that Laidlaw's mercury exceedances had reduced the value of their homes. *Ante,* at 181–183. These averments alone cannot carry the plaintiffs' burden of demonstrating that they have suffered a "concrete and particularized" injury, *Lujan,* 504 U. S., at 560. General allegations of injury may suffice at the pleading stage, but at summary judgment plaintiffs must set forth "specific facts" to support their claims. *Id.,* at 561. And where, as here, the case has proceeded to judgment, those specific facts must be " 'supported adequately by the evidence adduced at trial,' " *ibid.* (quoting *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 115, n. 31 (1979)). In this case, the affidavits themselves are

woefully short on "specific facts," and the vague allegations of injury they do make are undermined by the evidence adduced at trial.

Typically, an environmental plaintiff claiming injury due to discharges in violation of the Clean Water Act argues that the discharges harm the environment, and that the harm to the environment injures him. This route to injury is barred in the present case, however, since the District Court concluded after considering all the evidence that there had been "no demonstrated proof of harm to the environment," 956 F. Supp. 588, 602 (SC 1997), that the "permit violations at issue in this citizen suit did not result in any health risk or environmental harm," *ibid.*, that "[a]ll available data . . . fail to show that Laidlaw's *actual* discharges have resulted in harm to the North Tyger River," *id.*, at 602–603, and that "the overall quality of the river exceeds levels necessary to support . . . recreation in and on the water," *id.*, at 600.

The Court finds these conclusions unproblematic for standing, because "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Ante,* at 181. This statement is correct, as far as it goes. We have certainly held that a demonstration of harm to the environment is not *enough* to satisfy the injury-in-fact requirement unless the plaintiff can demonstrate how he personally was harmed. *E. g., Lujan, supra,* at 563. In the normal course, however, a lack of demonstrable harm to the environment will translate, as it plainly does here, into a lack of demonstrable harm to citizen plaintiffs. While it is perhaps possible that a plaintiff could be harmed even though the environment was not, such a plaintiff would have the burden of articulating and demonstrating the nature of that injury. Ongoing "concerns" about the environment are not enough, for "[i]t is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions," *Los Angeles* v. *Lyons,* 461 U. S. 95, 107, n. 8 (1983). At the very least, in

the present case, one would expect to see evidence support-
ing the affidavits' bald assertions regarding decreasing
recreational usage and declining home values, as well as
evidence for the improbable proposition that Laidlaw's
violations, even though harmless to the environment, are
somehow responsible for these effects. Cf. *Gladstone*,
*supra*, at 115 (noting that standing could be established by
"convincing evidence" that a decline in real estate values was
attributable to the defendant's conduct). Plaintiffs here
have made no attempt at such a showing, but rely entirely
upon unsupported and unexplained affidavit allegations of
"concern."

Indeed, every one of the affiants deposed by Laidlaw
cast into doubt the (in any event inadequate) proposition
that subjective "concerns" actually affected their conduct.
Linda Moore, for example, said in her affidavit that she
would use the affected waterways for recreation if it were
not for her concern about pollution. Record, Doc. No. 71
(Exhs. 45, 46). Yet she testified in her deposition that she
had been to the river only twice, once in 1980 (when she
visited someone who lived by the river) and once after this
suit was filed. Record, Doc. No. 62 (Moore Deposition 23–
24). Similarly, Kenneth Lee Curtis, who claimed he was in-
jured by being deprived of recreational activity at the river,
admitted that he had not been to the river since he was "a
kid," *ibid.* (Curtis Deposition, pt. 2, p. 38), and when asked
whether the reason he stopped visiting the river was because
of pollution, answered "no," *id.*, at 39. As to Curtis's claim
that the river "looke[d] and smell[ed] polluted," this condi-
tion, if present, was surely not caused by Laidlaw's dis-
charges, which according to the District Court "did not
result in any health risk or environmental harm." 956
F. Supp., at 602. The other affiants cited by the Court were
not deposed, but their affidavits state either that they *would*
use the river if it were not polluted or harmful (as the court
subsequently found it is not), Record, Doc. No. 21 (Exhs. 7,

8, and 9), or said that the river looks polluted (which is also incompatible with the court's findings), *ibid.* (Exh. 10). These affiants have established nothing but "subjective apprehensions."

The Court is correct that the District Court explicitly found standing—albeit "by the very slimmest of margins," and as "an awfully close call." App. in No. 97–1246 (CA4), pp. 207–208 (Tr. of Hearing 39–40 (June 30, 1993)). That cautious finding, however, was made in 1993, long before the court's 1997 conclusion that Laidlaw's discharges did not harm the environment. As we have previously recognized, an initial conclusion that plaintiffs have standing is subject to reexamination, particularly if later evidence proves inconsistent with that conclusion. *Gladstone,* 441 U. S., at 115, and n. 31; *Wyoming* v. *Oklahoma,* 502 U. S. 437, 446 (1992). Laidlaw challenged the existence of injury in fact on appeal to the Fourth Circuit, but that court did not reach the question. Thus no lower court has reviewed the injury-in-fact issue in light of the extensive studies that led the District Court to conclude that the environment was not harmed by Laidlaw's discharges.

Inexplicably, the Court is untroubled by this, but proceeds to find injury in fact in the most casual fashion, as though it is merely confirming a careful analysis made below. Although we have previously refused to find standing based on the "conclusory allegations of an affidavit," *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 888 (1990), the Court is content to do just that today. By accepting plaintiffs' vague, contradictory, and unsubstantiated allegations of "concern" about the environment as adequate to prove injury in fact, and accepting them even in the face of a finding that the environment was not demonstrably harmed, the Court makes the injury-in-fact requirement a sham. If there are permit violations, and a member of a plaintiff environmental organization lives near the offending plant, it would be difficult not to satisfy today's lenient standard.

## II

The Court's treatment of the redressability requirement—which would have been unnecessary if it resolved the injury-in-fact question correctly—is equally cavalier. As discussed above, petitioners allege ongoing injury consisting of diminished enjoyment of the affected waterways and decreased property values. They allege that these injuries are caused by Laidlaw's continuing permit violations. But the remedy petitioners seek is neither recompense for their injuries nor an injunction against future violations. Instead, the remedy is a statutorily specified "penalty" for past violations, payable entirely to the United States Treasury. Only last Term, we held that such penalties do not redress any injury a citizen plaintiff has suffered from past violations. *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 106–107 (1998). The Court nonetheless finds the redressability requirement satisfied here, distinguishing *Steel Co.* on the ground that in this case petitioners allege ongoing violations; payment of the penalties, it says, will remedy petitioners' injury by deterring future violations by Laidlaw. *Ante*, at 185–186. It holds that a penalty payable to the public "remedies" a threatened private harm, and suffices to sustain a private suit.

That holding has no precedent in our jurisprudence, and takes this Court beyond the "cases and controversies" that Article III of the Constitution has entrusted to its resolution. Even if it were appropriate, moreover, to allow Article III's remediation requirement to be satisfied by the indirect private consequences of a public penalty, those consequences are entirely too speculative in the present case. The new standing law that the Court makes—like all expansions of standing beyond the traditional constitutional limits—has grave implications for democratic governance. I shall discuss these three points in turn.

## A

In *Linda R. S.* v. *Richard D.*, 410 U. S. 614 (1973), the plaintiff, mother of an illegitimate child, sought, on behalf of herself, her child, and all others similarly situated, an injunction against discriminatory application of Art. 602 of the Texas Penal Code. Although that provision made it a misdemeanor for "any parent" to refuse to support his or her minor children under 18 years of age, it was enforced only against married parents. That refusal, the plaintiff contended, deprived her and her child of the equal protection of the law by denying them the deterrent effect of the statute upon the father's failure to fulfill his support obligation. The Court held that there was no Article III standing. There was no "'direct' relationship," it said, "between the alleged injury and the claim sought to be adjudicated," since "[t]he prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative." *Id.*, at 618. "[Our cases] demonstrate that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.*, at 619.

Although the Court in *Linda R. S.* recited the "logical nexus" analysis of *Flast* v. *Cohen*, 392 U. S. 83 (1968), which has since fallen into desuetude, "it is clear that standing was denied . . . because of the unlikelihood that the relief requested would redress appellant's claimed injury." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 79, n. 24 (1978). There was no "logical nexus" between nonenforcement of the statute and Linda R. S.'s failure to receive support payments because "[t]he prospect that prosecution will . . . result in payment of support" was "speculative," *Linda R. S., supra*, at 618—that is to say, it was uncertain whether the relief would prevent the injury.[1] Of

---

[1] The decision in *Linda R. S.* did not turn, as today's opinion imaginatively suggests, on the father's short-term inability to pay support if imprisoned. *Ante*, at 188, n. 4. The Court's only comment upon the impris-

course precisely the same situation exists here. The principle that "in American jurisprudence . . . a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another" applies no less to prosecution for civil penalties payable to the State than to prosecution for criminal penalties owing to the State.

The Court's opinion reads as though the only purpose and effect of the redressability requirement is to assure that the plaintiff receive *some* of the benefit of the relief that a court orders. That is not so. If it were, a federal tort plaintiff fearing repetition of the injury could ask for tort damages to be paid not only to himself but to other victims as well, on the theory that those damages would have at least some deterrent effect beneficial to him. Such a suit is preposterous because the "remediation" that is the traditional business of Anglo-American courts is relief specifically tailored to the plaintiff's injury, and not *any* sort of relief that has some incidental benefit to the plaintiff. Just as a "generalized grievance" that affects the entire citizenry cannot satisfy the injury-in-fact requirement even though it aggrieves the plaintiff along with everyone else, see *Lujan,* 504 U. S., at 573–574, so also a generalized remedy that deters all future unlawful activity against all persons cannot satisfy the remediation requirement, even though it deters (among other things) repetition of this particular unlawful activity against these particular plaintiffs.

Thus, relief against prospective harm is traditionally afforded by way of an injunction, the scope of which is limited by the scope of the threatened injury. *Lewis* v. *Casey,* 518 U. S. 343, 357–360 (1996); *Lyons,* 461 U. S, at 105–107, and n. 7. In seeking to overturn that tradition by giving an indi-

---

onment was that, unlike imprisonment for civil contempt, it would not condition the father's release upon payment. The Court then continued: "The prospect that prosecution will, at least in the future"—*i. e.,* upon completion of the imprisonment—"result in payment of support can, at best, be termed only speculative." *Linda R. S.,* 410 U. S., at 618.

vidual plaintiff the power to invoke a public remedy, Congress has done precisely what we have said it cannot do: convert an "undifferentiated public interest" into an "individual right" vindicable in the courts. *Lujan, supra,* at 577; *Steel Co.,* 523 U. S., at 106. The sort of scattershot redress approved today makes nonsense of our statement in *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208, 222 (1974), that the requirement of injury in fact "insures the framing of relief no broader than required by the precise facts." A claim of particularized future injury has today been made the vehicle for pursuing generalized penalties for past violations, and a threshold showing of injury in fact has become a lever that will move the world.

## B

As I have just discussed, it is my view that a plaintiff's desire to benefit from the deterrent effect of a public penalty for past conduct can never suffice to establish a case or controversy of the sort known to our law. Such deterrent effect is, so to speak, "speculative as a matter of law." Even if that were not so, however, the deterrent effect in the present case would surely be speculative as a matter of fact.

The Court recognizes, of course, that to satisfy Article III, it must be "likely," as opposed to "merely speculative," that a favorable decision will redress plaintiffs' injury, *Lujan, supra,* at 561. See *ante,* at 180–181. Further, the Court recognizes that not *all* deterrent effects of *all* civil penalties will meet this standard—though it declines to "explore the outer limits" of adequate deterrence, *ante,* at 187. It concludes, however, that in the present case "the civil penalties sought by FOE carried with them a deterrent effect" that satisfied the "likely [rather than] speculative" standard. *Ibid.* There is little in the Court's opinion to explain why it believes this is so.

The Court cites the District Court's conclusion that the penalties imposed, along with anticipated fee awards, pro-

vided "adequate deterrence." *Ante,* at 178, 187; 956 F. Supp., at 611. There is absolutely no reason to believe, however, that this meant "deterrence adequate to prevent an injury to these plaintiffs that would otherwise occur." The statute does not even *mention* deterrence in general (much less deterrence of future harm to the particular plaintiff) as one of the elements that the court should consider in fixing the amount of the penalty. (That element can come in, if at all, under the last, residual category of "such other matters as justice may require." 33 U. S. C. § 1319(d).) The statute does require the court to consider "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, [and] the economic impact of the penalty on the violator . . . ." *Ibid.;* see 956 F. Supp., at 601. The District Court meticulously discussed, in subsections (a) through (e) of the portion of its opinion entitled "Civil Penalty," *each one* of those specified factors, and then—under subsection (f) entitled "Other Matters As Justice May Require," it discussed "1. Laidlaw's Failure to Avail Itself of the Reopener Clause," "2. Recent Compliance History," and "3. The Ever-Changing Mercury Limit." There is no mention whatever—in this portion of the opinion or anywhere else—of the degree of deterrence necessary to prevent future harm to these particular plaintiffs. Indeed, neither the District Court's final opinion (which contains the "adequate deterrence" statement) nor its earlier opinion dealing with the preliminary question whether South Carolina's previous lawsuit against Laidlaw constituted "diligent prosecution" that would bar citizen suit, see 33 U. S. C. § 1365(b)(1)(B), displayed *any awareness* that deterrence of *future injury to the plaintiffs* was necessary to support standing.

The District Court's earlier opinion did, however, quote with approval the passage from a District Court case which began: " 'Civil penalties seek to deter pollution by discourag-

ing future violations. To serve this function, the amount of the civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business.'" App. 122, quoting *PIRG* v. *Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1166 (NJ 1989). When the District Court concluded the "Civil Penalty" section of its opinion with the statement that "[t]aken together, this court believes the above penalty, potential fee awards, and Laidlaw's own direct and indirect litigation expenses provide adequate deterrence under the circumstances of this case," 956 F. Supp., at 611, it was obviously harking back to this general statement of what the statutorily prescribed factors (and the "as justice may require" factors, which in this case did not include particularized or even generalized deterrence) were designed to achieve. It meant no more than that the court believed the civil penalty it had prescribed met the statutory standards.

The Court points out that we have previously said "'all civil penalties have some deterrent effect,'" *ante*, at 185 (quoting *Hudson* v. *United States*, 522 U. S. 93, 102 (1997)). That is unquestionably true: As a general matter, polluters as a class are deterred from violating discharge limits by the *availability* of civil penalties. However, none of the cases the Court cites focused on the deterrent effect of a single *imposition* of penalties on a particular lawbreaker. Even less did they focus on the question whether that particularized deterrent effect (if any) was enough to redress the injury of a citizen plaintiff in the sense required by Article III. They all involved penalties pursued by the government, not by citizens. See *id.*, at 96; *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S. 767, 773 (1994); *Tull* v. *United States*, 481 U. S. 412, 414 (1987).

If the Court had undertaken the necessary inquiry into whether significant deterrence of the plaintiffs' feared injury was "likely," it would have had to reason something like this: Strictly speaking, no polluter is deterred by a penalty for

past pollution; he is deterred by the *fear* of a penalty for *future* pollution. That fear will be virtually nonexistent if the prospective polluter knows that all emissions violators are given a free pass; it will be substantial under an emissions program such as the federal scheme here, which is regularly and notoriously enforced; it will be even higher when a prospective polluter subject to such a regularly enforced program has, as here, been the object of public charges of pollution and a suit for injunction; and it will surely be near the top of the graph when, as here, the prospective polluter has already been subjected to *state* penalties for the past pollution. The deterrence on which the plaintiffs must rely for standing in the present case is the marginal increase in Laidlaw's fear of future penalties that will be achieved by adding federal penalties for Laidlaw's past conduct.

I cannot say for certain that this marginal increase is zero; but I can say for certain that it is entirely speculative whether it will make the difference between these plaintiffs' suffering injury in the future and these plaintiffs' going unharmed. In fact, the assertion that it will "likely" do so is entirely farfetched. The speculativeness of that result is much greater than the speculativeness we found excessive in *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 43 (1976), where we held that denying § 501(c)(3) charitable-deduction tax status to hospitals that refused to treat indigents was not sufficiently likely to assure future treatment of the indigent plaintiffs to support standing. And it is much greater than the speculativeness we found excessive in *Linda R. S.* v. *Richard D.,* discussed *supra,* at 203–204, where we said that "[t]he prospect that prosecution [for nonsupport] will . . . result in payment of support can, at best, be termed only speculative," 410 U. S., at 618.

In sum, if this case is, as the Court suggests, within the central core of "deterrence" standing, it is impossible to imagine what the "outer limits" could possibly be. The Court's expressed reluctance to define those "outer limits"

serves only to disguise the fact that it has promulgated a revolutionary new doctrine of standing that will permit the entire body of public civil penalties to be handed over to enforcement by private interests.

## C

Article II of the Constitution commits it to the President to "take Care that the Laws be faithfully executed," Art. II, § 3, and provides specific methods by which all persons exercising significant executive power are to be appointed, Art. II, § 2. As JUSTICE KENNEDY's concurrence correctly observes, the question of the conformity of this legislation with Article II has not been argued—and I, like the Court, do not address it. But Article III, no less than Article II, has consequences for the structure of our government, see *Schlesinger*, 418 U. S., at 222, and it is worth noting the changes in that structure which today's decision allows.

By permitting citizens to pursue civil penalties payable to the Federal Treasury, the Act does not provide a mechanism for individual relief in any traditional sense, but turns over to private citizens the function of enforcing the law. A Clean Water Act plaintiff pursuing civil penalties acts as a self-appointed mini-EPA. Where, as is often the case, the plaintiff is a national association, it has significant discretion in choosing enforcement targets. Once the association is aware of a reported violation, it need not look long for an injured member, at least under the theory of injury the Court applies today. See *supra*, at 198–201. And once the target is chosen, the suit goes forward without meaningful public control.[2] The availability of civil penalties vastly dis-

---

[2] The Court points out that the Government is allowed to intervene in a citizen suit, see *ante*, at 188, n. 4; 33 U. S. C. § 1365(c)(2), but this power to "bring the Government's views to the attention of the court," *ante*, at 188, n. 4, is meager substitute for the power to decide whether prosecution will occur. Indeed, according the Chief Executive of the United States the ability to intervene does no more than place him on a par with John

proportionate to the individual injury gives citizen plaintiffs massive bargaining power—which is often used to achieve settlements requiring the defendant to support environmental projects of the plaintiffs' choosing. See Greve, The Private Enforcement of Environmental Law, 65 Tulane L. Rev. 339, 355–359 (1990). Thus is a public fine diverted to a private interest.

To be sure, the EPA may foreclose the citizen suit by itself bringing suit. 33 U. S. C. § 1365(b)(1)(B). This allows public authorities to avoid private enforcement only by accepting private direction as to when enforcement should be undertaken—which is no less constitutionally bizarre. Elected officials are entirely deprived of their discretion to decide that a given violation should not be the object of suit at all, or that the enforcement decision should be postponed.[3] See § 1365(b)(1)(A) (providing that citizen plaintiff need only wait 60 days after giving notice of the violation to the government before proceeding with action). This is the predictable and inevitable consequence of the Court's allowing the use of public remedies for private wrongs.

### III

Finally, I offer a few comments regarding the Court's discussion of whether FOE's claims became moot by reason of Laidlaw's substantial compliance with the permit limits. I do not disagree with the conclusion that the Court reaches. Assuming that the plaintiffs had standing to pursue civil penalties in the first instance (which they did not), their claim

---

Q. Public, who can intervene—whether the Government likes it or not—when the United States files suit. § 1365(b)(1)(B).

[3] The Court observes that "the Federal Executive Branch does not share the dissent's view that such suits dissipate its authority to enforce the law," since it has "endorsed this citizen suit from the outset." Ante, at 188, n. 4. Of course, in doubtful cases a long and uninterrupted history of Presidential acquiescence and approval can shed light upon the constitutional understanding. What we have here—acquiescence and approval by a single administration—does not deserve passing mention.

might well not have been mooted by Laidlaw's voluntary compliance with the permit, and leaving this fact-intensive question open for consideration on remand, as the Court does, *ante*, at 193–194, seems sensible.[4] In reaching this disposition, however, the Court engages in a troubling discussion of the purported distinctions between the doctrines of standing and mootness. I am frankly puzzled as to why this discussion appears at all. Laidlaw's claimed compliance is squarely within the bounds of our "voluntary cessation" doctrine, which is the basis for the remand. *Ante*, at 193.[5]

---

[4] In addition to the compliance and plant-closure issues, there also remains open on remand the question whether the current suit was foreclosed because the earlier suit by the State was "diligently prosecuted." See 33 U. S. C. § 1365(b)(1)(B). Nothing in the Court's opinion disposes of the issue. The opinion notes the District Court's finding that Laidlaw itself played a significant role in facilitating the State's action. *Ante*, at 178, n. 1, 186, n. 2. But there is no incompatibility whatever between a defendant's facilitation of suit and the State's diligent prosecution—as prosecutions of felons who confess their crimes and turn themselves in regularly demonstrate. Laidlaw was entirely within its rights to prefer state suit to this private enforcement action; and if it had such a preference it would have been prudent—given that a State must act within 60 days of receiving notice of a citizen suit, see § 1365(b)(1)(A), and given the number of cases state agencies handle—for Laidlaw to make sure its case did not fall through the cracks. South Carolina's interest in the action was not a feigned last minute contrivance. It had worked with Laidlaw in resolving the problem for many years, and had previously undertaken an administrative enforcement action resulting in a consent order. 890 F. Supp. 470, 476 (SC 1995). South Carolina has filed an *amicus* brief arguing that allowing citizen suits to proceed despite ongoing state enforcement efforts "will provide citizens and federal judges the opportunity to relitigate and second-guess the enforcement and permitting actions of South Carolina and other States." Brief for South Carolina as *Amicus Curiae* 6.

[5] Unlike JUSTICE STEVENS' concurrence, the opinion for the Court appears to recognize that a claim for civil penalties is moot when it is clear that no future injury to the plaintiff at the hands of the defendant can occur. The concurrence suggests that civil penalties, like traditional damages remedies, cannot be mooted by absence of threatened injury. The analogy is inapt. Traditional money damages are payable to compensate

There is no reason to engage in an interesting academic excursus upon the differences between mootness and standing in order to invoke this obviously applicable rule.[6]

Because the discussion is not essential—indeed, not even relevant—to the Court's decision, it is of limited significance. Nonetheless, I am troubled by the Court's too-hasty retreat from our characterization of mootness as "the doctrine of standing set in a time frame." *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 68, n. 22 (1997). We have repeatedly recognized that what is required for litigation to continue is essentially identical to what is required for litigation to begin: There must be a justiciable case or controversy as required by Article III. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell* v. *McCormack,* 395 U. S. 486, 496 (1969). A court may not

for the harm of past conduct, which subsists whether future harm is threatened or not; civil penalties are privately assessable (according to the Court) to deter threatened future harm to the plaintiff. Where there is no threat to the plaintiff, he has no claim to deterrence. The proposition that impossibility of future violation does not moot the case holds true, of course, for civil-penalty suits by the government, which do not rest upon the theory that some particular future harm is being prevented.

[6] The Court attempts to frame its exposition as a corrective to the Fourth Circuit, which it claims "confused mootness with standing." *Ante,* at 189. The Fourth Circuit's conclusion of nonjusticiability rested upon the belief (entirely correct, in my view) that the only remedy being pursued on appeal, civil penalties, would not redress FOE's claimed injury. 149 F. 3d 303, 306 (1998). While this might be characterized as a conclusion that FOE had no standing to pursue civil penalties from the outset, it can also be characterized, as it was by the Fourth Circuit, as a conclusion that, when FOE declined to appeal denial of the declaratory judgment and injunction, and appealed only the inadequacy of the civil penalties (which it had no standing to pursue) the *case as a whole became moot.* Given the Court's erroneous conclusion that civil penalties can redress private injury, it of course rejects both formulations—but neither of them necessitates the Court's academic discourse comparing the mootness and standing doctrines.

proceed to hear an action if, subsequent to its initiation, the dispute loses "its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract propositions of law." *Hall* v. *Beals*, 396 U. S. 45, 48 (1969) *(per curiam)*. See also *Preiser* v. *Newkirk*, 422 U. S. 395, 401 (1975); *Steffel* v. *Thompson*, 415 U. S. 452, 459, n. 10 (1974). Because the requirement of a continuing case or controversy derives from the Constitution, *Liner* v. *Jafco, Inc.*, 375 U. S. 301, 306, n. 3 (1964), it may not be ignored when inconvenient, *United States* v. *Alaska S. S. Co.*, 253 U. S. 113, 116 (1920) (moot question cannot be decided, "[h]owever convenient it might be"), or, as the Court suggests, to save "sunk costs," compare *ante*, at 192, with *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 480 (1990) ("[R]easonable caution is needed to be sure that mooted litigation is not pressed forward . . . solely in order to obtain reimbursement of sunk costs").

It is true that mootness has some added wrinkles that standing lacks. One is the "voluntary cessation" doctrine to which the Court refers. *Ante*, at 189. But it is inaccurate to regard this as a reduction of the basic requirement for standing that obtained at the beginning of the suit. A genuine controversy must exist at both stages. And just as the initial suit could be brought (by way of suit for declaratory judgment) before the defendant actually violated the plaintiff's alleged rights, so also the initial suit can be continued even though the defendant has stopped violating the plaintiff's alleged rights. The "voluntary cessation" doctrine is nothing more than an evidentiary presumption that the controversy reflected by the violation of alleged rights continues to exist. *Steel Co.*, 523 U. S., at 109. Similarly, the fact that we do not find cases moot when the challenged conduct is "capable of repetition, yet evading review" does not demonstrate that the requirements for mootness and for standing differ. "Where the conduct has ceased for the time being

but there is a demonstrated probability that it will recur, a real-life controversy between parties with a personal stake in the outcome continues to exist." *Honig* v. *Doe,* 484 U. S. 305, 341 (1988) (SCALIA, J., dissenting) (emphasis deleted).

Part of the confusion in the Court's discussion is engendered by the fact that it compares standing, on the one hand, with mootness *based on voluntary cessation,* on the other hand. *Ante,* at 190. The required showing that it is "absolutely clear" that the conduct "could not reasonably be expected to recur" is *not* the threshold showing required for mootness, but the heightened showing required in a particular category of cases where we have sensibly concluded that there is reason to be skeptical that cessation of violation means cessation of live controversy. For claims of mootness based on changes in circumstances other than voluntary cessation, the showing we have required is less taxing, and the inquiry is indeed properly characterized as one of " 'standing set in a time frame.' " See *Arizonans, supra,* at 67, 68, n. 22 (case mooted where plaintiff's change in jobs deprived case of "still vital claim for prospective relief"); *Spencer* v. *Kemna,* 523 U. S. 1, 7 (1998) (case mooted by petitioner's completion of his sentence, since "throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision" (internal quotation marks omitted)); *Lewis, supra,* at 478–480 (case against State mooted by change in federal law that eliminated parties' "personal stake" in the outcome).

In sum, while the Court may be correct that the parallel between standing and mootness is imperfect due to realistic evidentiary presumptions that are by their nature applicable only in the mootness context, this does not change the underlying principle that " '[t]he requisite personal interest that must exist at the commencement of the litigation . . . must continue throughout its existence . . . .' " *Arizonans, supra,*

at 68, n. 22 (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 397 (1980)).

\*    \*    \*

By uncritically accepting vague claims of injury, the Court has turned the Article III requirement of injury in fact into a "mere pleading requirement," *Lujan*, 504 U. S., at 561; and by approving the novel theory that public penalties can redress anticipated private wrongs, it has come close to "mak[ing] the redressability requirement vanish," *Steel Co.*, *supra*, at 107. The undesirable and unconstitutional consequence of today's decision is to place the immense power of suing to enforce the public laws in private hands. I respectfully dissent.