**Bruce HOWE, Representative of the Estate of Fred L. Charon, Plaintiff,**

v.

**Charles HULL, M.D., et al., Defendants.**

**No. 3:92CV7658.**

United States District Court, N.D. Ohio, Western Division.

Nov. 21, 1994.

Marc E. Elovitz, Ruth E. Harlow, and William B. Rubenstein, American Civil Liberties Union Foundation, New York City, Ellen Simon Sacks, Spangenberg, Shibley, Traci, Lancione & Liber, Cleveland, OH, Doris K. Wohl, Wohl & Associates, Toledo, OH, for Bruce Howe.

Doris K. Wohl, Wohl & Associates, Toledo, OH, for Fred L. Charon.

Rolf M. Scheidel, Shumaker, Loop & Kendrick, Toledo, OH, for Charles E. Hull, M.D.

James M.L. Ferber, Schottenstein, Zox & Dunn, Columbus, OH, Timothy D. Krugh, Robison, Curphey & O'Connell, Toledo, OH, for Memorial Hosp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN W. POTTER, District Judge.

This cause was brought by the plaintiff as representative of the Estate of Fred Charon under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Federal Rehabilitation Act of 1973 (FRA), and the Emergency Medical Treatment and Active Labor Act (EMTALA). Plaintiff also brought supplemental state law claims of intentional and negligent infliction of emotional distress. This Court, by a Memorandum and Order dated May 26, 1994, granted defendant Hull's motion for summary judgment on plaintiff's EMTALA and negligent infliction of emotional distress claims, and denied the motion as to the ADA, FRA and intentional infliction of emotional distress claims. In that same order, the Court granted defendant Memorial Hospital's motion for summary judgment on plaintiff's negligent infliction of emotional distress claim, and denied the motion as to plaintiff's ADA, FRA, EMTALA, and intentional infliction of emotional distress claims.

A trial was held between May 31, 1994 and June 14, 1994. Plaintiff's remaining FRA, EMTALA, and intentional infliction of emotional distress claims were tried to a jury, and plaintiff's ADA claims were tried to the bench by stipulation of the parties and pursuant to the applicable provisions of the ADA. On June 14, the jury returned a special verdict in favor of the defendants on the EMTALA and intentional infliction of emotional distress claims and against both defendants on the FRA claim, awarding plaintiff $62,000.00 compensatory damages. The jury also awarded punitive damages in the amount of $150,000.00 against defendant Hull and $300,000.00 against defendant Memorial Hospital.

Plaintiff brought suit in this action alleging that, on April 17, 1992, the defendants re-

fused to provide him medical treatment because he was infected with HIV. The original plaintiff in this case, Fred L. Charon, is deceased, and plaintiff Howe was substituted as the representative of Mr. Charon's estate on June 10, 1993. Defendant Memorial Hospital is the facility where plaintiff sought treatment, and defendant Hull was the on-call admitting physician at Memorial Hospital when plaintiff sought treatment.

On April 17, 1992, Charon and Howe were travelling through Ohio, on their way to vacation in Wisconsin. Mr. Charon, a resident of Portland, Maine, was HIV-positive and had AIDS at the time. At approximately 9:00 on the morning of the April 17, Charon took a prescription medication called floxin which he had not taken before.

Charon had a severe reaction to the floxin. Charon vomited, began feeling light headed, had difficulty grasping objects, and suffered from a high fever, a rash, and extreme redness of the skin. Howe and Charon exited the highway due to Charon's condition. After consulting via the telephone with Charon's treating physician in Maine, they sought the nearest hospital. Howe conversed with Memorial Hospital personnel on the telephone and then drove Charon to Memorial Hospital and sought treatment in the emergency room.

Dr. Mark Reardon examined Charon in the emergency room. Dr. Reardon found that Charon was suffering from fever, severe erythema (redness of the skin) over virtually his entire body; erythematous conjunctivae; hot, painful and tender skin; arthralgia (painful joints); testicular pain; and headache. Dr. Reardon determined that Charon was suffering from a very serious allergic drug reaction and that he should be admitted to Memorial Hospital.

Dr. Reardon worried that this very severe drug reaction may ultimately develop into toxic epidermal necrolysis (TEN).[1] Despite the fact that Dr. Reardon at the time only considered TEN to be a possibility, he ultimately entered "probable toxic epidermal necrolysis" into Charon's medical record.

Although Memorial Hospital had the capability to effectively treat a severe allergic drug reaction and, in fact, did treat patients suffering from allergic drug reactions on a fairly routine basis, Memorial Hospital had neither the necessary equipment nor medical specialists necessary to effectively treat TEN.

After determining that Charon needed to be admitted to Memorial Hospital, Dr. Reardon telephoned Dr. Hull to obtain the necessary approval for Charon's admission. Dr. Hull, a physician with staff privileges at Memorial, was the hospital's on-call admitting physician. As the on-call admitting physician, Dr. Hull was in a position of authority at Memorial Hospital and was responsible for determining whether patients could be admitted from the emergency room into the hospital. Dr. Hull had the authority and discretion to admit Mr. Charon to Memorial Hospital for treatment.

Dr. Reardon told Dr. Hull that Charon was HIV-positive and was suffering from a severe allergic drug reaction. Dr. Reardon also told Dr. Hull that this condition was not related to Charon's HIV or AIDS status. An argument ensued between the two physicians over whether Charon's condition had progressed from HIV-positive to full-blown AIDS. Dr. Hull was concerned that Charon had progressed to AIDS, because he felt that patients with AIDS should be treated in special AIDS programs.

Dr. Reardon told Dr. Hull that Charon's condition was "not related to AIDS or HIV infection in any way." Despite this, Dr. Hull remained primarily concerned about Charon's AIDS/HIV status. Dr. Hull never asked Dr. Reardon why he was concerned about the possibility of TEN. During the course of their discussion, Dr. Hull told Dr. Reardon that "[i]f you get an AIDS patient in the hospital, you will never get him out." Dr. Reardon subsequently recorded this statement in Charon's medical records.

Dr. Hull ultimately refused to admit Charon to Memorial Hospital. Dr. Reardon could have attempted to contact other physicians

---

**1.** TEN is a very rare and often deadly disease that causes a patient's skin to slough off the body.

with staff privileges at Memorial Hospital in order to get Charon admitted; however, since it was a Friday evening, Reardon doubted whether he could promptly locate an admitting physician who was not "on-call." Due to the severity of Charon's drug reaction, Reardon felt he had to get the patient admitted to a hospital for care quickly. Consequently, acting on the suggestion of Dr. Hull, Dr. Reardon contacted the Medical College of Ohio (MCO) and arranged to have Charon transferred and admitted to that facility.

Dr. Reardon called Dr. Chris Lynn at MCO and asked if Lynn would accept admission of a patient with a severe drug reaction. Dr. Reardon never mentioned to Dr. Lynn that Charon possibly had the very rare TEN or that TEN was the reason for the transfer. Dr. Reardon also did not ask Dr. Lynn whether MCO had the capability to treat TEN. Dr. Reardon did tell Dr. Lynn that he had to transfer Charon because he "could not find a physician who was able to do it, to admit the patient and the concern was raised because he was HIV positive, that was the reason he could not be admitted to Memorial Hospital."

When Dr. Reardon returned from his conversations with Dr. Hull and Dr. Lynn, he explained to Charon and Howe that Charon would have to be transferred to MCO. Dr. Reardon never mentioned the possibility that Charon might have TEN, nor told Charon that TEN was the reason for the transfer. Dr. Reardon did state to Charon and Howe that "this is a small community and the admitting doctor does not feel comfortable admitting him."

At the end of his shift in the emergency room, Dr. Reardon recorded Dr. Hull's statement about AIDS patients in the official emergency room records. Dr. Reardon also recorded that Mr. Charon's allergic drug reaction was "not related to AIDS or HIV infection in any way."

Dr. Hull did not come to the Memorial Hospital emergency room, a four mile trip from his home, until after Dr. Reardon's shift had ended and arrangements for Charon's transfer had been made. When Dr. Hull did eventually come to the emergency room, he neither examined Charon, looked at him nor reviewed his chart, despite the fact that he knew that Charon was waiting in the emergency room and had not yet been transferred to MCO.

While at MCO, Charon was examined by Dr. Roger MacArthur, an infectious disease specialist. Dr. MacArthur testified that Charon suffered from "a very simple drug reaction." Dr. MacArthur was "surprised" that he was even consulted on the case because Charon's condition was very "straightforward." Dr. MacArthur further stated that "[s]imply because [Charon] was HIV-positive doesn't mandate a consult from an infectious disease specialist."

Dr. Hull testified that the appropriate treatment for someone with TEN was at a hospital with a specialized burn unit, and that a TEN patient should be under the care of a dermatologist. Memorial Hospital had neither a burn unit nor a staff dermatologist. However, MCO, the hospital Dr. Hull recommended transferring Charon to, also did not have a burn unit. Charon was also never examined by a dermatologist during the course of his treatment at MCO.

When treated at MCO, Charon was treated for a simple, albeit severe, allergic drug reaction. Mr. Charon did not have TEN. He had a simple allergic drug reaction that was unrelated to and uncomplicated by his HIV/AIDS status. Memorial Hospital had the capability on April 17, 1992 to treat patients suffering from allergic drug reactions and did routinely treat patients suffering from allergic drug reactions.

In this order, the Court will make its findings of fact and conclusions of law. Since the FRA the ADA claims share common factual questions, the Court is bound by the jury's determination on those common factual issues as memorialized on the special verdict forms. *In re Lewis*, 845 F.2d 624 (6th Cir.1988). The Court observes that, had this case been tried solely to the bench, it would independently make these same factual findings. In accordance with Fed.R.Civ.P. 52(a), the Court has considered and weighed all of the evidence and resolved any conflicts there-

in and now makes its independent findings of fact and conclusions of law.

## Findings of Fact

1. Defendant Memorial Hospital is a hospital that employed more than 25 employees and had gross receipts of more than $1,000,000.00 for each year from 1991 to 1994.

2. Memorial Hospital delegated to Dr. Hull the authority to admit or not admit patients to Memorial Hospital.

3. On April 17, 1992, defendant Hull was a physician with staff privileges at Memorial Hospital. Defendant Hull's refusal to admit Charon was within the ambit of his discretion as on-call admitting physician. The refusal to admit Charon was not a result of an institutional policy of refusing to treat AIDS patients; it was, however, within the scope of his authority as on-call admitting physician.

4. Charon did not have, nor was he ever diagnosed with, TEN. Charon had a simple, albeit severe, allergic drug reaction. The articulated reason for the refusal to admit, the possible TEN "diagnosis," was a pretext.

5. Memorial Hospital had the capability to treat Charon's allergic drug reaction.

6. Fred Charon had AIDS on April 17, 1992. AIDS is a fatal disease which substantially limits one or more major life activities.

7. On April 17, 1992, the defendants refused to admit Charon for treatment to Memorial Hospital.

8. Charon's AIDS/HIV status was the motivating factor in the defendants' refusal to admit and treat him at Memorial Hospital.

## Conclusions of Law

1. This Court has federal question jurisdiction over this action brought under the Americans with Disabilities Act (ADA). 28 U.S.C. § 1331; 42 U.S.C. § 12101 *et seq.*

2. The ADA prohibits discrimination based upon disability by places of public accommodation:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to) or operates a place of public accommodation.

42 U.S.C. § 12182(a).

3. Fremont Memorial Hospital, as a public accommodation that employed more than 25 employees and had gross receipts in excess of $1,000,000.00 in 1992, was subject to the ADA on April 17, 1992.

4. An individual may be subject to personal liability under the ADA. Given the broad language and remedial purposes of the ADA, allowing individual liability in some circumstances under 42 U.S.C. § 12182(a) is consistent with both the plain language of the statute and congressional intent. To hold differently would allow individuals with both the authority and the discretion to make decisions based on a discriminatory animus to violate the ADA with a degree of impunity not envisioned by Congress. *See United States v. Morvant,* 843 F.Supp. 1092 (E.D.La. 1994) (allowing individual liability for the operator of a dental office under the ADA); *EEOC v. AIC Security Investigations, Ltd.,* No. 92C7330, 1993 WL 427454, at 9 (N.D.Ill. Oct. 21 1993) ("[a]bsent a clear and express statutory directive to the contrary, this court does not believe that the remedial purposes of the ADA were intended to relieve from personal liability those supervisory employees committing discriminatory acts"); *Vakharia v. Swedish Covenant Hospital,* 824 F.Supp. 769, 784–86 (N.D.Ill.1993) (personal liability must be based on individual acts distinct from institutional procedure).

5. This Court holds that, under 42 U.S.C. § 12182(a), an individual may be liable as an operator of a public accommodation where (a) he or she is in a position of authority; (b) within the ambit of this authority he or she has both the power and discretion to perform potentially discriminatory acts; and (c) the discriminatory acts are the result of the exercise of the individual's own discretion, as opposed to the implementation of institutional policy or the mandates of superiors. *See Memorandum and Order* of this Court of May 26, 1994, pp. 12–14. *See also Carparts Distribution Center, Inc., v. Auto-*

*motive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 15–19 (1st Cir.1994) (broadly interpreting Title I & III of the ADA, and holding that, under Title I, a health insurer may be an "employer" under the ADA where the insurer functions as an employer by controlling an important aspect of employment or where insurer existed solely for the purpose of allowing employer to delegate potentially discriminatory decisions to the insurer).

■ 6. On April 17, 1992, Dr. Hull "operated" Memorial Hospital within the meaning of the ADA. He was in a position of authority at Memorial; he was a Vice–Chief of Staff; the Medical Director of Special Services; and, as the on-call admitting physician, had the authority and discretion to admit Charon to Memorial for treatment. Further, Dr. Hull's decision regarding Charon was not the implementation of an institutional policy at Memorial.

■ 7. Memorial Hospital is liable under the ADA for Dr. Hull's actions on April 17, 1992 because it explicitly delegated the authority of on-call admitting physician to him. *See Clark v. Southview Hospital*, 68 Ohio St.3d 435, 628 N.E.2d 46 (1994).

8. Dr. Hull's actions in operating Memorial Hospital on April 17, 1992 are governed by the effective date applicable to Memorial Hospital. Therefore, Dr. Hull was subject to the ADA's non-discrimination mandate on April 17, 1992.

■ 9. The fact that Dr. Reardon did not attempt to find another physician who might have been willing to admit Charon to Memorial Hospital is irrelevant to this action. Given the circumstances, Dr. Reardon felt that his chosen course of action would get Charon admitted to and treated by a hospital most expeditiously. Under the emergency room circumstances, Dr. Reardon did not have to conduct a plebiscite of Memorial Hospital physicians. Further, this suit is between plaintiff and the defendants, not plaintiff and Dr. Reardon.

■ 10. There are three criteria plaintiff must meet in order to establish a prima facie case of discrimination under the ADA:

a) the plaintiff has a disability;

b) the defendant discriminated against the plaintiff;

c) the discrimination was on the basis of the disability.

42 U.S.C. § 12182(a) & 42 U.S.C. § 12182(b).

■ 11. A disability is defined as "a physical or mental impairment that substantially limits the person in one or more major life activities." 42 U.S.C. § 12102(2)(A). AIDS and HIV infection are both disabilities within the meaning of the ADA. *T.E.P. v. Leavitt*, 840 F.Supp. 110, 111 (D.Utah 1993); 28 C.F.R. § 36.104(1)(B)(ii).

12. Discrimination in public accommodation can take the form of the denial of the opportunity to receive medical treatment, segregation unnecessary for the provision of effective medical treatment, unnecessary screening or eligibility requirements for treatment, or provision of unequal medical benefits based upon the disability. 42 U.S.C. § 12182(b)(1)(A)(i), § 12182(b)(1)(A)(iii), § 12182(b)(2)(A)(i), § 12182(b)(1)(A)(ii).

13. The ADA's public accommodation provision prohibits discrimination "on the basis of disability." 42 U.S.C. § 12182(a). To prove that the discrimination was "on the basis of" Charon's disability, plaintiff must prove that Charon's disability was a motivating factor in the decision not to admit him to Memorial Hospital. *See Wessel v. AIC Security Investigations, Ltd.*, No. 92 C7330, 1993 WL 22687 (jury instructions) (N.D.Ill.1993), *reprinted in* 31 Illinois Labor and Employment Law Bulletin (Sept.1993) (jury required to find that plaintiff's "disability was a motivating factor in the decision to discharge him."). *See also* H.R.Rep. No. 485 (II), 101st Cong., 2nd Sess. 86 (1990), U.S.Code Cong. & Admin.News 1990, pp. 267, 368 ("[t]he existence of non-disability related factors ... does not immunize defendants in the ADA cases and ... the entire ... procedure must be reviewed to determine if the disability was improperly considered") (citations omitted).

■ 14. Nothing in the ADA compels a health care provider to treat an individual who requires care beyond the provider's ability or expertise. A provider may refer an individual with a disability to another health care provider if, in the normal course of its

operations, "the referring provider would make a similar referral for an individual without a disability who seeks or requires the same treatment or services." 28 C.F.R. § 36.302(b)(1).

The ADA is not a medical malpractice statute. The test, whether the referring provider would similarly refer an individual without a disability, implies a contemporaneous analysis of the referring provider's subjective belief at the time of the referral. Thus, a provider who believes that a disabled individual requires treatment beyond the provider's capability for a medical condition that is unrelated to the disability, may refer that individual to another provider if the provider would likewise refer an individual without a disability in the same fashion.[2]

15. On April 17, 1992, Charon had a disability as defined by the ADA.

■ 16. Dr. Hull's refusal to admit Charon constituted a denial of the opportunity to receive medical treatment as defined by the ADA. 42 U.S.C. § 12182(b)(1)(A)(i).[3] In light of this conclusion and the conclusions that follow, the Court need not reach the issue of whether the refusal to admit Charon to Memorial Hospital and the subsequent transfer to MCO also constituted segregation unnecessary for the provision of effective medical treatment, use of unnecessary screening criteria, or provision of unequal medical benefits. 42 U.S.C. § 12182(b)(1)(A)(iii), § 12182(b)(2)(A)(i), § 12182(b)(1)(A)(ii).

17. The defendants offered a valid reason, the TEN diagnoses, for refusing to admit Charon. Because that reason was a pretext, however, plaintiff rebutted the proffered reason. Charon was diagnosed as suffering from a simple drug reaction which did not require treatment beyond defendants' capabilities.

18. Defendant Hull improperly considered Charon's disability in refusing to admit Charon to Memorial Hospital. The Court's finding, that Charon's AIDS/HIV status was the motivating factor in Dr. Hull's refusal to admit him to Memorial Hospital, requires the conclusion that defendants' discriminatory action was on the basis of Charon's disability. 42 U.S.C. § 12182. This is consistent with the jury's finding that, under the FRA, the defendants discriminated against Charon solely on the basis of disability.

19. Defendants' actions on April 17, 1992 constituted a discriminatory denial of the opportunity to participate in or benefit from a public accommodation and, as such, violated the Americans with Disabilities Act.

■ 20. The ADA provides for injunctive relief as a remedy in private civil suits brought for violations of its public accommodations provision. 42 U.S.C. § 12188(b)(2)(A)(i).

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that judgment be, and hereby is, entered in favor of plaintiff; and it is

FURTHER ORDERED that defendants are permanently enjoined from any further violations of the Americans with Disabilities Act; and it is

FURTHER ORDERED that defendants are to prominently post signs in their waiting rooms stating that

This health care provider is prohibited by law from discriminating on the basis of HIV or AIDS. If you believe that this

---

2. Clearly, where the disability and the medical condition for which treatment is sought are unrelated, the health care provider may not properly consider the disability in referring the patient elsewhere. The more complicated question, however, concerns a medical condition that is complicated by the disability. Given the disposition of this case, the Court need not reach, and specifically declines to address, whether a health care provider may properly consider an individual's disability when that disability complicates the medical condition for which the individual is seeking treatment.

3. It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

health care provider has discriminated on the basis of AIDS or HIV, you may wish to consult with an attorney.