William J. BLAKE and Theresa R. Blake individually and as administrators of the Estate of Betty Ann Blake, Plaintiffs,

v.

SOUTHCOAST HEALTH SYSTEM, INC., d/b/a Charlton Hospital; First Physicians Corporation, Inc.; Miguel Brillantes; Michael A. Pellegrino; and Thomas F. Cahill, Defendants.

No. Civ.A. 00–10591–WGY.

United States District Court, D. Massachusetts.

June 12, 2001.

Philip N. Beauregard, John A. Markey, Beauregard & Burke, New Bedford, MA, for plaintiffs.

Colleen Cronin, William J. Davenport, Bloom & Buell, Curtis R. Diedrich, Sloane & Walsh, Nadine Nasser Donovan, Rindler & Morgan, P.C., Joanne Gulliford Hoban, Alan B. Rindler, Rindler & Morgan, Boston, MA, Joan Eldridge, Martin C. Foster, Foster & Eldridge, Cambridge, MA, Stephen P. Harten, Ratcliffe & Burke, LLP, Providence, RI, for defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

The Hippocratic philosophy of medicine [1] declares that nothing should be more important to a physician than the best interests of the patient who comes to him for care.... Few people faced with a diagnosis of potentially remediable ... disease should be willing to give up the struggle if there is any reasonable chance that some promising form of treatment is available to lessen the ravages of the disease or cure it. To do anything less is not stoicism, but folly.[2]

Behind the arid record of every legal case are genuine human beings with hopes, fears, aspirations, and an almost prayerful desire that sound laws will be wisely administered. Occasionally, though, there comes before the Court a situation evidencing such profound and shocking institutional incompetence leading to such unspeakable agony that the very stones of

---

1. I swear by Apollo Physician and Asclepius and Hygieia and Panaceia and all the gods and goddesses, making them my witnesses, that I will fulfil according to my ability and judgment this oath and this covenant:

To hold him who has taught me this art as equal to my parents and to live my life in partnership with him, and if he is in need of money to give him a share of mine, and to regard his offspring as equal to my brothers....

I will apply dietetic measures for the benefit of the sick according to my ability and judgment; I will keep them from harm and injustice.

Ludwig Edelstein, *The Hippocratic Oath: Text, Translation and Interpretation* 3 (1943).

2. Sherwin B. Nuland, *How We Die: Reflections on Life's Final Chapter* 246 (1994).

the courthouse would seem to cry out for relief.[3]

This is such a case.

## I. The Facts[4]

Betty Ann Blake ("Betty Ann"), born in 1951, suffered from severe mental retardation, microcephaly,[5] scoliosis, blindness, deafness, and muteness. She weighed a mere fifty-five pounds. Despite her disabilities, Betty Ann, with the help of her parents, lived a fulfilling life. Her parents, William J. Blake ("Mr.Blake") and Theresa R. Blake ("Mrs.Blake"), despite repeated advice to institutionalize Betty Ann from birth because of her disabilities, chose to keep her at home with their family and to care for her as long as they could. While the Blakes cared for Betty Ann in their home, they provided her with not only loving and nurturing surroundings, but also special care specific to her disability, including special education, occupational therapy, and physical therapy. When the Blakes could no longer care for Betty Ann because of their own advancing age, however, they made the difficult decision to place her in another's care. In 1996, after forty-four years, Betty Ann moved out of her parents' home and into a group home in Fall River, Massachusetts. After this split, the Blakes made sure to visit Betty Ann on a regular basis.

On Friday, October 30, 1998, while at her day care program, Betty Ann began to choke on a large piece of meat—she repeatedly grabbed at her throat; she had substantial secretion and drooling; and she had difficulty breathing. Requiring immediate medical treatment, Betty Ann was rushed to the emergency room at Charlton Hospital,[6] the closest emergency medical facility. Betty Ann arrived at 12:00 Noon, still exhibiting pronounced symptoms of choking and respiratory distress.

Were the reader to stop here, she might feel relief that Betty Ann was so quickly placed in the hands of medical care professionals, fully capable of providing life-saving care to Betty Ann. But Betty Ann's story does not end here. Instead of offering appropriate medical assistance, the doctors prolonged Betty Ann's slow suffocation for twenty-six hours and ultimately caused her agonizing death.[7]

Very well then.

---

3. See Habakkuk 6:11.

4. As is appropriate when dealing with a motion to dismiss, the Court recounts the facts as they appear in the complaint, drawing all reasonable inferences in favor of the cause of action pled. Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co., 214 F.3d 216, 223 n. 6 (1st Cir.2000). Recognizing the shocking nature of the allegations, at the motion hearing held on February 28, 2001, the Court afforded the defendants the chance to withdraw the motion to dismiss and, instead, face these issues in the context of a prompt, well-pleaded motion for summary judgment. Surely, the Court reasoned, the evidentiary record could be no worse for the defendant healthcare providers than the allegations of the complaint. The defendants refused, saying in essence, "So what if this is what we did. Because our discrimination and in-attention in fact killed her, the law simply provides no remedy."

5. Microcephaly is a disorder in which the individual has a head size that is significantly below average for the individual's age and sex.

6. Southcoast Health System, Inc., d/b/a Charlton Hospital ("Charlton Hospital"). Charlton Hospital contracted with First Physicians Corp. ("First Physicians") to provide emergency medical services. Dr. Michael A. Pellegrino ("Dr. Pellegrino") was employed by First Physicians pursuant to this contract.

7. Death by asphyxia resulting from choking is particularly gruesome:

If the food plug is not forced out, the process of suffocation continues unchecked. The pulse quickens, the blood pressure rises, and the level of carbon dioxide in the

Upon Betty Ann's arrival at Charlton Hospital, Dr. Pellegrino, the emergency room physician on duty, and several nurses observed Betty Ann's symptoms of choking. Although it goes without saying that emergency situations require immediate action, Betty Ann's doctor did not take such action. Instead, he and the nurses tied Betty Ann down on a stretcher and left her alone behind a curtain.

The Blakes, who arrived shortly after Betty Ann, consulted with Dr. Pellegrino. Dr. Pellegrino, who had not looked down Betty Ann's throat, suggested that she had burned her esophagus eating hot food. The Blakes explained to Dr. Pellegrino that this was impossible because Betty Ann never ate hot foods. The Blakes then proceeded to tell Dr. Pellegrino that Betty Ann was choking—she was signaling that she was choking; she was grabbing at her throat; and she was having trouble breathing. With this knowledge in hand, however, Dr. Pellegrino still did not remove the food obstructing Betty Ann's airway. He performed only cursory checks for food, and did not attempt more effective treatments, such as using a scope, because, as he put it, it would be "difficult." His limited efforts proving useless, Dr. Pellegrino left Betty Ann, still slowly choking to death, for two hours without further medical treatment. Her parents' insistence that Betty Ann was choking and their pleas for treatment went unheeded.

It was now 5:30 p.m. Five-and-a-half hours had passed while Betty Ann suffered slow and painful strangulation, increasingly deprived of air. Still having received no

treatment, Betty Ann was admitted to the hospital. Dr. Miguel Brillantes ("Dr. Brillantes") was assigned to care for Betty Ann once admitted. The Blakes repeated to Dr. Brillantes that Betty Ann was choking. His response was twofold. First, he prescribed Benadryl—a decongestant utterly ineffective for relieving Betty Ann's choking. Second, he asked the Blakes if they wanted a "do not resuscitate order." Dr. Brillantes thus appeared to recognize that Betty Ann was struggling for her life—yet he turned away, doing nothing further.

Betty Ann was left to gasp for air throughout the night. Blind and deaf, separated from her loving parents, she slowly strangled while in the care of those whose *first* duty it was to save her life. One cannot begin even to speculate as to the thoughts that crowded through the mind of this lonely, isolated individual.

That same evening, both Dr. Pellegrino and Dr. Brillantes consulted a third physician, Dr. Thomas F. Cahill ("Dr. Cahill"), about Betty Ann's condition. Dr. Cahill "declined" to come to the hospital to observe Betty Ann first hand. He did, however, look in on her on the following afternoon—Saturday, October 31, 1998—by which time Betty Ann had been struggling to breathe for more than twenty-four hours.

Had there been any doubt that Betty Ann was choking, it was removed when, after merely observing Betty Ann and talking briefly with the Blakes, Dr. Cahill recognized—finally—that he faced an ex-

---

blood increases rapidly to a state called hypercarbia. Hypercarbia produces extreme anxiety, and the decreased oxygen makes the frightened victim appear blue, or cyanotic. He makes increasingly strenuous attempts to pull air past the obstruction, which only serve to wedge the plug even more firmly in place. Just as in hanging, unconsciousness intervenes, and sometimes convulsions triggered by the unoxygenated and hypercarbic brain.... [T]he efforts to breathe become weaker and more shallow. The heartbeat becomes irregular, and finally stops.

Nuland, *supra* note 2, at 160.

treme emergency situation requiring immediate action. At approximately 2:30 p.m., Dr. Cahill x-rayed Betty Ann and performed a scope of her throat. With the help of another specialist, Dr. Cahill was at last able to remove the large piece of meat that had been blocking Betty Ann's esophagus and depriving her of air for two days.

Dr. Cahill was too late. The delay in removing the blockage from Betty Ann's throat caused her to develop severe heart and lung complications. The late removal of the blockage could not reverse her worsening condition. On Saturday afternoon, Betty Ann suffered a heart attack. Her lungs filled with liquid, and she suffered convulsions.

Betty Ann died Sunday morning, November 1, 1998, as a direct result of the fact[8] that Charlton Hospital, First Physicians, and the named doctors discriminated against her as a disabled person.

## II. Analysis

Charlton Hospital, First Physicians, and the named doctors now come before this Court seeking dismissal of the plaintiffs'[9] claim against them under the Americans with Disabilities Act ("ADA" or "Act") (Count I) on the ground that the Estate lacks standing to sue under Title III of that Act.

### A. *Standard of Review*

Dismissal is appropriate "only if 'it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief.'" *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957]). In making this determination, the Court should "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992) (citing *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13 [1st Cir.1989]).

Nonetheless, the standard for dismissal is not without any bite. In taking plaintiffs' allegations as true, the Court may "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." *Dartmouth Review*, 889 F.2d at 16 (quoting *Chongris v. Bd. of Appeals*, 811 F.2d 36, 37 [1st Cir.1987]) (internal quotation marks omitted). Moreover, plaintiffs must set forth in their complaints " 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'" *Id.* (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 [1st Cir.1988]).

### B. *The Americans With Disabilities Act*

Signed into law on July 26, 1990 with great fanfare,[10] the ADA was expected to

---

8. The Court necessarily must draw this inference as the defendants choose to confront this case upon a motion to dismiss. *See supra* n. 4.

9. The plaintiffs, Mr. and Mrs. Blake and the Estate of Betty Ann Blake, shall be referred to collectively herein as the "Estate."

10. *See, e.g.*, Ann Devroy, *In Emotion–Filled Ceremony, Bush Signs Rights Law for America's Disabled*, Wash. Post, July 27, 1990, at A18 ("[The Act] heralds a new beginning for

the 43 million Americans with disabilities and their families ... [and] its provisions will shape the lives of those with disabilities for decades to come." [quoting Sandra Swift Parrino, the former chairperson of the National Council on Disability] ); Terry Wilson, *For the Disabled, It's "Independence Day"*, Chi. Trib., July 27, 1990, at D1 (describing the festivities surrounding the enactment of the ADA); *id.* ("In a ceremony on the South Lawn of the White House, [President George] Bush compared the act with the dismantling of the

"eradicat[e] the bigotry and barriers faced by individuals with disabilities." *Walker v. Carnival Cruise Lines,* 107 F.Supp.2d 1135, 1143 (N.D.Cal.2000). The four purposes of the Act, as set forth by Congress, are:

> (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
>
> (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
>
> (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
>
> (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b).

Title III of the ADA prohibits discrimination by places of public accommodation, specifically providing that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). The ADA specifically includes hospitals among public accommodations. *Id.* § 12181(7)(F).

The remedies available under Title III for private party suits, however, are limited to injunctive relief, restraining orders, or other similar relief. *Id.* § 12188 (incorporating by reference the remedies and procedures set forth in 42 U.S.C. § 2000a–3[a] ). Historically, the District of Massachusetts has been well suited to the framing of sensible and sensitive equitable orders in institutional litigation of this sort. *Rogers v. Okin,* 638 F.Supp. 934 (D.Mass. 1986) (Tauro, J.) (reforming state institutions for the mentally handicapped), *vacated on other grounds,* 821 F.2d 22 (1st Cir.1987); *United States v. Metro. Dist. Comm'n,* 23 Env't Rep.Cas. (BNA) 1350, 1985 WL 9071 (D.Mass.1985) (Mazzone, J.) (Boston Harbor cleanup).

## C. *Standing*

Recognizing the limitations on seeking injunctive relief, however, all of the defendants here seek to dismiss the Estate's ADA claim on the ground that the Estate lacks standing to sue for an injunction. To paraphrase the defendants' reasoning:

> Title III of the ADA only allows for an injunctive remedy. In order to have standing to sue for an injunction, Betty Ann must be able to show a risk of future harm. Because Betty Ann is dead—strangled to death—she is at no risk of future harm. Therefore, the Estate has no standing to sue under Title III of the ADA. Q.E.D.

*See* Defs.' Mot. at 3–4. As obdurately callous as this reasoning is, it nonetheless requires analysis.

 In order to demonstrate standing generally, a plaintiff must prove three elements: (1) the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest that is both concrete and particularized, and actual or imminent; (2) there must be causality—a causal connection between the injury and the con-

Berlin Wall in the symbolic freedom it offers.").

duct of which the plaintiff complains; and (3) there must be redressability—it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130.

### 1. *City of Los Angeles v. Lyons*

■ In *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court set forth the specific standing requirements for plaintiffs seeking injunctive relief. In *Lyons,* the plaintiff sought an injunction that would prevent Los Angeles police officers from using control chokeholds, except in situations in which an individual appeared to be threatening the immediate use of deadly force. *Id.* at 98, 103 S.Ct. 1660. Relying on past Supreme Court precedent, the Court held that Lyons lacked standing to sue for such injunctive relief because he failed to show that he was "likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105, 103 S.Ct. 1660. The Court stated that although Lyons may have been illegally choked by the police on an earlier date, this past injury was sufficient to provide him standing to sue for damages, but not an injunction. In seeking injunctive relief, the mere fact that one has been injured in the past is insufficient to satisfy the standing requirement. *Id.* at 95–96, 102, 103 S.Ct. 1660 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." [quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ] [internal quotation marks omitted] [alteration in original] ); *Lujan,* 504 U.S. at 564, 112 S.Ct.

2130 (quoting *Lyons*); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lyons* approvingly); *Am. Postal Workers Union v. Frank,* 968 F.2d 1373, 1376 (1st Cir. 1992) ("[*Lyons* ] reaffirmed the principle that past exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief absent a sufficient likelihood that he will again be wronged in a similar way." [internal quotation marks omitted] ). Thus, the fact that the Estate has standing to sue for damages does not create standing to sue for an injunction. The Estate must demonstrate standing for *each* form of relief sought. *Lyons,* 461 U.S. at 109, 103 S.Ct. 1660.

In *Lyons,* the Supreme Court focused on the redressability element of standing, which requires the proposed relief to be likely to redress the plaintiff's injury. *Frank,* 968 F.2d at 1376. "[*Lyons* ] is based on the obvious proposition that a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." *Id.*

■ Under the *Lyons* standing standard, the fact that the defendants' discriminatory malpractice killed Betty Ann seemingly leads to the inevitable conclusion that the Estate cannot show any risk of future harm. Yet application of the *Lyons* standard to this case is unsettling, because it allows the most egregious cases of institutional disability discrimination in violation of the ADA to continue unabated. Nonetheless, because the Supreme Court spoke broadly about the standing requirements for plaintiffs seeking injunctions, logically speaking, those requirements apply to injunctions sought for violations of the ADA. Indeed, every court to have considered the standing requirements under Title III of the ADA has held that in order for a

private litigant to prove standing, she must show a risk of future harm. *E.g., Jairath v. Dyer,* 154 F.3d 1280, 1283 n. 8 (11th Cir.1998) (holding that plaintiff had no standing because he had no intention of seeking further medical advice or treatment from defendant); *Plumley v. Landmark Chevrolet, Inc.,* 122 F.3d 308, 312 (5th Cir.1997) (holding that ADA claim under Title III did not survive plaintiff's death).[11]

The Estate attempts to distinguish these cases and *Lyons* on the ground that they did not involve a plaintiff who *died as a result of* the ADA violation. Pls.' Opp'n at 9 ("To ... dismiss[ ] [for lack of standing in such circumstances] would place the remedies of the ADA beyond the reach of the people who most deserve the attention of the federal court...."). This is an important distinction. It is troubling that the *Lyons* standard effectively forbids courts from enjoining egregious institutional conduct that in the past has caused, and in the future may cause, death.

But the Supreme Court was well aware that its decision in *Lyons* might have this consequence. The majority in *Lyons* knew that, by denying Lyons standing, it was permitting the Los Angeles police to continue to use chokeholds in violation of citizens' constitutional rights: "Of course, it may be that among the countless encounters between the police and the citizens of ... Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim." *Lyons,* 461 U.S. at 108, 103 S.Ct. 1660. The dissent in *Lyons* also pointed out the broader consequences of the Court's decision:

The Court's decision removes an entire class of constitutional violations from the equitable powers of a federal court. It immunizes from prospective equitable relief any policy that authorizes persistent deprivations of constitutional rights as long as no individual can establish with substantial certainty that he will be injured, or injured again, in the future.... Chief Justice [Burger] asked in *Bivens v. Six Unknown Fed[eral] Narcotics Agents,* 403 U.S. 388, 419, 91 S.Ct.

11. *See also, e.g., Deck v. Am. Haw. Cruises, Inc.,* 121 F.Supp.2d 1292, 1296–1301 (D.Haw.2000) (reviewing the standing elements and case law and holding that plaintiff had no standing because she did not allege that she would use defendant's services again); *Stan v. Wal–Mart Stores, Inc.,* 111 F.Supp.2d 119, 125–26 (N.D.N.Y.2000) (no standing, in part, because no likelihood that plaintiff would return to store); *United States v. York Obstetrics & Gynecology, P.A.,* No. 00–8–P–DMC, 2000 WL 1221625, at *5 (D.Me. Aug.25, 2000) (no standing because no showing that plaintiff would use health care provider again or that it would discriminate against her again); *Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 830, 832–33 (D.Md. 1998) (no standing because unlikely that plaintiff would return to hospital); *Filardi v. Loyola Univ.,* No. 97 C 1814, 1998 WL 111683, at *2–*3 (N.D.Ill. Mar.12, 1998) (no standing because plaintiff graduated); *Delil v. El Torito Rests. Inc.,* No. C 94–3900–CAL, 1997 WL 714866, at *2–*4 (N.D.Cal. June 24, 1997) (no standing because plaintiff lived one hundred miles away from restaurant, so no showing of a real and immediate threat of future harm); *Wood v. Sink,* No. 6:95CV00362, 1996 WL 544376, at *3 (M.D.N.C. July 30, 1996) (no standing because no showing that plaintiffs would re-enter the real estate market); *Hoepfl v. Barlow,* 906 F.Supp. 317, 320 (E.D.Va.1995) (no standing because plaintiff moved far away from defendant); *Schroedel v. N.Y. Univ. Med. Ctr.,* 885 F.Supp. 594, 599 (S.D.N.Y.1995) (no standing because it was mere speculation that plaintiff would need emergency room assistance again, that she would use the defendant hospital again, or that she would be discriminated again if she did); *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329, 1333–34 (N.D.Cal. 1994) (no standing because no showing that plaintiff would use hospital again or that it would discriminate against her again).

1999, 29 L.Ed.2d 619 (1971) (dissenting opinion), "what would be the judicial response to a police order authorizing 'shoot to kill' with respect to every fugitive?" His answer was that it would be "easy to predict our collective wrath and outrage." [*Id.*] We now learn that wrath and outrage cannot be translated into an order to cease the unconstitutional practice, but only an award of damages to those who are victimized by the practice and live to sue and to the survivors of those who are not so fortunate. Under the view expressed by the majority today, if the police adopt a policy of "shoot to kill," or a policy of shooting one out of ten suspects, the federal courts will be powerless to enjoin its continuation. The federal judicial power is now limited to levying a toll for such a systematic constitutional violation.

*Lyons*, 461 U.S. at 137, 103 S.Ct. 1660 (Marshall, J., dissenting) (citation omitted). Indeed, the instant case exemplifies Justice Marshall's concerns. Yet the majority was not moved by these obvious ramifications of its analysis.

### 2. *The ADA's Broader Policy Concerns*

The Estate urges this Court, however, to distinguish this case from *Lyons* by taking into account the broader policy concerns that specifically underlie the ADA. Pls.' Opp'n at 5. The plaintiffs argue that Congress envisioned that courts would grant broad injunctions, stretching the limits of the standing requirements, in order to eradicate discrimination in public accommodations. *Id.* at 7–8. This Court recognizes that the ADA was fashioned to "provide a clear and comprehensive national mandate" for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1); *see also Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir.1994).[12] Yet the important policy concerns that the ADA embodies are insufficient to give rise to standing in this case. Betty Ann, her parents, and her estate cannot derive standing by alleging that other disabled individuals may suffer injuries from discrimination by these defendants in the future. *Allen v. Wright*, 468 U.S. 737, 755–56, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Betty Ann (or her parents) must "*personally* [be] subject to the challenged discrimination." *Id.* at 755, 104 S.Ct. 3315 (emphasis added).

In support of their position, the plaintiffs point to two lines of cases: (1) cases in which courts allowed suits to proceed even though there was no evidence of future harm, Pls.' Opp'n at 7–8; and (2) cases arising from violations of the ADA in which injunctions were granted that "benefitted not only the named individual plaintiffs, but [also] other persons similarly situated who are at risk of being discriminated against by the named defendant," *id.* at 7. The Court will examine each line of cases in turn.

First, the plaintiffs' reliance on *Howe v. Hull*, 873 F.Supp. 72 (N.D.Ohio 1994), is

---

**12.** The Estate's characterization of the ADA as allowing a private litigant to sue as a private attorney general, Pls.' Opp'n at 7, however, takes the wording of the ADA too far. The private litigant must demonstrate that she has standing to sue for the relief she seeks. Indeed, the ADA provides for different forms of relief depending on whether the Attorney General or a private litigant brings suit. *See infra* pp. 136. The plaintiffs, reliance on *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 410–02, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), does not aid them. *Newman* concerned the applicability of attorney's fees for private suits under the ADA; it did not address the issue of standing to seek an injunction.

misplaced. Although the Northern District of Ohio ultimately granted an injunction under Title III, even though the plaintiff was deceased, *id.* at 79, the court did not discuss standing at all. Standing is a threshold inquiry. The court's failure to address the issue in *Howe,* however, leaves one in doubt whether it even considered it.[13] The case either does not support the Blakes' position or, if it does, this Court considers it unpersuasive.

Second, the plaintiffs' reliance on cases in which courts granted injunctions for violations of the ADA beyond the scope of the plaintiff's injury is similarly misplaced. These cases do not imply that the Estate has standing. Although courts in such cases have granted broad injunctions, the individual plaintiffs were still required to show that they were at risk of future harm. Thus, even these broad injunctions had boundaries—they remedied only those ADA violations that were related to the plaintiff's specific disability.

For example, in *Steger v. Franco,* Inc., 228 F.3d 889 (8th Cir.2000), the plaintiff, who was blind, sought an injunction to bring a building into full compliance with the ADA. *Id.* at 893. The defendant argued, however, that because the plaintiff's only injury was from a failure to place ADA-compliant signs at the first floor men's restroom, the injunction should remedy only this injury. *Id.* at 893–94. The court rejected the defendant's argument, reasoning that such a limited injunction would be inefficient and impractical and would result in mere "piecemeal compliance." *Id.* at 894. The court concluded that the plaintiff had standing to sue for an injunction to bring the building into ADA compliance with respect to *all* violations that affected the blind even though the plaintiff had only suffered injury from failure adequately to post signs. *Id.* at 893–94. Nevertheless, the court did not allow the plaintiff to seek an injunction to bring the building into *complete* ADA compliance because that *would* violate standing principles, as the plaintiff was not among the injured with respect to those ADA violations that did not affect the blind. *Id.* at 893.

Although the court in *Steger* allowed the plaintiff to seek an injunction for injuries broader than he actually suffered, it specifically limited the injunction to his disability in order to preserve the Article III standing requirement. *Steger* does not stand for the proposition that plaintiffs have standing to sue to enjoin discrimination absent a showing of future harm. If anything, *Steger* demonstrates that even courts that are willing to grant broad injunctions require plaintiffs to show that the injunctions sought would redress their harm, and hence these courts limit injunctions to those ADA violations that could possibly injure plaintiffs in the future. *Id.;* see also *Parr v. L & L Drive–Inn Rest.,* 96 F.Supp.2d 1065, 1082 (D.Haw.2000) (denying standing for injunction beyond the scope of the plaintiff's disability because there was no possibility that the plaintiff would be injured in the future by ADA

13. *Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698 (D.Or.1997), relied upon by the plaintiffs for the proposition that a court should not "embrace a rule of standing that would allow an alleged wrongdoer to evade the court's jurisdiction so long as he does not injure the same person twice," Pls.' Opp'n at 9 (quoting *Indep. Living Res.,* 982 F.Supp. at 762), found standing despite the remote likelihood that the particular plaintiff would be injured again in the future. *Independent Living Resources* is distinguishable, however, because it involved an organization, in essence, suing as a class. *Id.* at 762–63. Thus, unlike the present case—in which there is no possibility that Betty Ann will suffer future harm—in *Independent Living Resources* there was a possibility that at least some member of the class of plaintiffs would experience future discrimination.

non-compliance not related to his disability).[14]

### 3. The Text of the ADA

Beyond the case law, the text of the ADA also suggests that Congress did not intend private litigants to be able to sue for an injunction in cases in which there was only past injury. "Nothing in the ADA or its legislative history suggests an intent to allow individuals, in clear derogation of the *Lyons* principles, to obtain injunctions on the basis of past wrongdoing alone." *Hoepfl v. Barlow*, 906 F.Supp. 317, 321 (E.D.Va.1995). Indeed, Title III's structure gives rise to the inference that Congress intended that private litigants only be able to seek redress for *future* injuries. *Id.* at 323–24. Title III allows both private litigants and the Attorney General to sue for ADA violations. 42 U.S.C. § 12188(a), (b). Private litigants include those "who [are] being subjected to discrimination," *id.* § 12188(a), which suggests *ongoing* discrimination, *id.* § 12188(a)(1). In contrast, the statutory provision that authorizes the Attorney General to sue allows him to commence a civil action if "any person ... has been discriminated against under this subchapter," suggesting that the Attorney General may sue for *past* discrimination. *Id.* § 12188(b)(1)(B)(ii). That the Attorney General may sue for past discrimination is consistent with the provision that only in suits instigated by the Attorney General

may monetary damages be awarded. *Id.* § 12188(b)(2)(B). These contrasting provisions are indicative of Congress's intent to allow private litigants to sue for an injunction only when there is ongoing discrimination. Thus, the proper mechanism for Betty Ann's equitable relief under the ADA is through the Attorney General, not a private lawsuit.[15]

Even if Congress *intended* to empower federal courts to issue injunctions absent a showing of future harm, Congress does not have the *power* to circumvent constitutionally mandated standing requirements. Although Congress can expand standing in the sense that it can, by statute, create more rights that may give rise to an injury in fact, it cannot eliminate Article III's case or controversy requirement altogether. The Constitution prohibits Congress from transforming past injury to give rise to standing to sue for an injunction. *Hoepfl*, 906 F.Supp. at 322.

The approach taken by Charlton Hospital, First Physicians, and the named doctors is callous indeed, but it is supported by the law. The defendants' discrimination against Betty Ann on the basis of her mental disability killed her, and her unconscionable death prevents Betty Ann and her family from seeking an injunction to prevent these defendants from repeating such malpractice and discrimination against others in the future. Thus, although equitable relief could be fashioned

---

**14.** The other cases the Blakes rely on are similarly distinguishable. *See Layton v. Elder*, 143 F.3d 469, 472 (8th Cir.1998) (allowing injunction under Title II beyond scope of injury, but not considering standing, and finding a showing of substantial irreparable harm for an injunction); *Anderson v. Pass Christian Isles Golf Club, Inc.*, 488 F.2d 855, 858 (5th Cir.1974) (allowing broad injunction beyond scope of plaintiff's injury under Title II for purposes of class action without addressing standing); *Bunjer v. Edwards*, 985 F.Supp.

165, 167 (D.D.C.1997) (allowing injunction beyond scope of plaintiff's injury but within his disability, and not considering standing); *D.B. v. Bloom*, 896 F.Supp. 166, 173 (D.N.J. 1995) (same).

**15.** In view of the egregious nature of the discrimination here claimed, the Clerk is directed to send a certified copy of this opinion to the Attorney General of the United States for such action as he may deem appropriate.

that would prevent discrimination against other mentally disabled individuals, this Court has no constitutional authority to grant the Estate such relief.[16]

## III. Conclusion

Left alone slowly to strangle, Betty Ann Blake endured, due to discrimination and malpractice, an agonizing death that our society would not mete out even to the most monstrous war criminal sentenced to be hanged.[17] But there is no possibility that the named defendants can harm Betty Ann in the future because their discrimination and malpractice killed her. Therefore, Betty Ann cannot further be harmed and her Estate lacks standing to sue for an injunction, the only available relief under Title III of the ADA. Accordingly, the Court must GRANT the defendants' Motion to Dismiss Count I of the Complaint [Docket No. 49].

The matter is one for the Attorney General of the United States.

---

**16.** This Court has scoured the law in search of some means by which the Estate could seek equitable relief in the federal courts under the ADA. But there is no loophole in the law that permits such relief.

Although *Lyons* focused on injunctive relief, the same principles apply to declaratory judgments. *Frank*, 968 F.2d at 1377 n. 4. Thus, the Estate does not have standing to sue for a declaratory judgment under the ADA. *Ashcroft v. Mattis*, 431 U.S. 171, 172, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977) (per curiam) ("For a declaratory judgment to issue, there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'" [quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242, 57 S.Ct. 461, 81 L.Ed. 617 (1937)]).

Nor do the Blakes have standing to sue for a declaratory judgment under the ADA because of their emotional involvement in the lawsuit. "Emotional involvement i[n] a lawsuit is not enough to meet the case-or-controversy requirement." *Id.* at 173, 97 S.Ct. 1739.

Nor can the Estate seek cover under the exception to mootness for unlawful activity that is capable of repetition, yet evading review. Such an exception does not create standing where none ever existed; rather, it is an exception only for those cases in which there initially was standing, but the case later became moot. *Friends of the Earth*, 528 U.S. at 190, 120 S.Ct. 693.

Nor is third party standing applicable to this case. Although party standing allows a party to assert the claims of other parties, the plaintiff must still independently have standing to sue. *Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (concluding that plaintiff had Article III standing before addressing whether he had third party standing to raise the claims of others); *Eisenstadt v. Baird*, 405 U.S. 438, 443–44, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (same).

**17.** Twelve leaders of Nazi Germany were found guilty of crimes against humanity and sentenced to death by hanging as a result of the trials held by the International Military Tribunal at Nuremberg. On October 16, 1946, ten of them were hanged. *Fuehrer's No. 2 Man Swallows Poison in Cell; Ribbentrop is First Through Trap; None Collapses, One Heils Hitler*, Wash. Post, Oct. 16, 1946, at 1. Master Sergeant John C. Woods performed the executions with the assistance of two others. *Id.* Kingsbury Smith, representing the combined American Press, witnessed the hangings at the Nuremberg jail. *Id.* When one such war criminal was dropped through the gallows trapdoor, the fall apparently did not break his neck, and he commenced to strangle at the rope's end. The hangman thereupon grabbed the swinging body and pulled down on it to break the criminal's neck swiftly. *See* Kingsbury Smith, *Execution of Nazi War Criminals, Nuremberg, 16 October 1946, in Eye–Witness: The 20th Century* 467, 474 (Jon E. Lewis ed., 1994). For varying accounts of the hangings at Nuremberg see Werner Maser, *Nuremberg: A Nation on Trial* 253–55 (Richard Barry trans., Allen Lane 1979) (1977); Joseph E. Persico, *Nuremberg: Infamy on Trial* 425–30 (1994); Telford Taylor, *The Anatomy of the Nuremberg Trials* 611 (1992); Ann Tusa & John Tusa, *The Nuremberg Trial* 486–87 (Papermac 1984) (1983).